[No. A058157. First Dist., Div. Two. Jan. 14, 1994.]

JEROME KATZ et al., Plaintiffs and Appellants, v.
CHEVRON CORPORATION et al., Defendants and Respondents.

## COUNSEL

Lionel Z. Glancy, Wechsler, Skirnick, Harwood, Halebian & Feffer, Stuart D. Wechsler, Andrew Davidovits, Curtis V. Trinko, Peggy J. Wedgworth, Savett, Frutkin, Podell & Ryan, Stuart Savett and Harvey Greenfield for Plaintiffs and Appellants.

Pillsbury, Madison & Sutro, William I. Edlund, Walter R. Allan, Walter J. Robinson and Terence M. Abad for Defendants and Respondents.

## OPINION

**BENSON, J.**—This action was brought by shareholders of the Chevron Corporation to challenge certain decisions made by the board of directors in response to the acquisition of approximately 8.8 percent of Chevron's common stock by the Pennzoil Company. The trial court found the directors' decisions protected by the business judgment rule and granted summary judgment in favor of Chevron. The shareholders appeal. We affirm the judgment.

### STATEMENT OF THE CASE AND FACTS

In early 1989, following a period in which Chevron Corporation's annual shareholder return was somewhat lower than that of other major oil companies, Chevron began to develop a five-year plan with the goal of increasing shareholder value. By the fall of 1989, planning for the 1990-1994 business plan was in its final stages and senior management felt its chances of success were good.

Chevron's Board of Directors (Board) at this time consisted of five management employees[1] and seven outside directors.[2] According to the declarations and evidence submitted in support of respondents' motion for summary judgment, in late September and early October 1989, a number of the directors noticed unusually heavy trading of Chevron stock. Chief Executive Officer Derr formed an ad hoc committee to attempt to determine the identity and motives of the accumulator or accumulators and to assess the possible impact of an accumulation on shareholder value. A special meeting of the Board was arranged for October 6, 1989, to inform the directors about the situation. On October 6, the corporate secretary, McAuley, reported to Derr that a stock specialist he contacted had indicated that large blocks of Chevron stock were being purchased and that based on the " 'aggressiveness' " of the buyers the specialist had a " 'strong feeling . . . that something out of the ordinary was going on.' " At the October 6 meeting, several of the outside directors suggested retaining experts to investigate the situation.[3]

In mid-October, Chevron retained the law firm of Fried, Frank, Harris, Shriver & Jacobson (Fried Frank) to assist Pillsbury, Madison & Sutro (Pillsbury), which was already advising the Board, in recommending actions that might be appropriate or necessary to protect and ensure the best interests of the shareholders in light of the stock accumulation. Chevron also hired the investment banking firm Goldman, Sachs & Co. (Goldman Sachs) to attempt to identify the accumulator, ascertain its motives and objectives and make recommendations. In addition, Chevron retained the Delaware law firm of Morris, Nichols, Arsht & Tunnell (Morris Nichols) to advise the Board on

---

[1]Kenneth Derr, Chevron's chief executive officer and president, had worked for Chevron since 1960, J. Dennis Bonney, vice-chairman of the board, had worked for Chevron or its subsidiaries since 1960, William Crain, a Chevron vice-president, had worked for Chevron since 1957; and James Sullivan, vice-president of the board, had worked for Chevron since 1961. Charles Renfrew became a Chevron vice-president in 1983 and a director in 1984, having previously been a partner at the law firm Pillsbury, Madison & Sutro.

[2]Samuel Armacost was a managing director of Merrill Lynch Capital Markets and had previously served a president and chief executive officer of BankAmerica Corporation and Bank of America. Sam Ginn was the chairman of the board and chief executive officer of the Pacific Telesis Group. Charles Pigott was the chairman of the board and chief executive officer of PACCAR Inc. George Schultz was a professor emeritus at Stanford University Graduate School of Business and had previously served as Secretary of State and as president of the Bechtel Corporation. S. Bruce Smart was Senior Counsellor of the World Resources Institute and had previously served as Undersecretary of Commerce for International Trade and as chairman and chief executive officer of the Continental Group. George Weyerhaeuser was chairman and chief executive officer of the Weyerhaeuser Company. John Young was president and chief executive officer of the Hewlett-Packard Company.

[3]The minutes of the October 6 meeting state only that "Mr. Derr reviewed the status of the current trading activity in Chevron stock." Nine of the twelve directors were present.

Delaware corporate law,[4] and formally retained a proxy solicitation firm, Georgeson & Co. (Georgeson), which was already investigating the identity of the accumulator pursuant to an informal request.

On October 24, representatives of Goldman Sachs and Fried Frank met with management and the ad hoc committee for several hours, circulating and reviewing a draft briefing book that contained information about recent stock activity, press reports, and possible accumulators. On October 25, at a regularly scheduled Board meeting, the directors were updated on the stock activity, informed that the various firms had been retained as expert advisors, and told that the advisors suspected Pennzoil, British Petroleum and Carl Icahn as possible accumulators.[5] Concerns were voiced that the accumulator's objectives might be inconsistent with Chevron's long term goals or other shareholders' interests.

On October 31, a special Board meeting was held concerning the stock situation. Derr advised the Board that Chevron stock price was continuing to rise on heavy volumes and that management was considering recommending authorization of an additional credit facility. Goldman Sachs presented detailed information about the stock activity and strategies the accumulator might attempt and their possible impact. Pennzoil was identified as a prime suspect because it had been making comments about its desire to buy oil and gas properties worth $3 billion; other possible accumulators were identified. Fried Frank reviewed Chevron's existing defensive mechanisms and analyzed possible changes to better protect shareholders if the Board determined the accumulation posed a threat to the corporation and shareholders' interests. These included amending the shareholder rights plan to lower the threshold for exercise of rights by which shareholders could dilute the voting power of an acquiror of a specified percentage of Chevron stock[6] and

---

[4]Chevron is a Delaware corporation.

[5]The minutes of the October 25 meeting simply state that "Mr. Derr reviewed the current activity in Chevron stock and the actions taken and being considered by the Company" and that Chevron had retained Goldman Sachs, Fried Frank, Pillsbury, and Georgeson. All the directors were present.

[6]Under Chevron's previously adopted stockholder rights plan, the shareholders held rights to purchase, under certain circumstances, fractional shares of preferred stock with voting and dividend rights comparable to common stock. These rights could be exercised only if 20 percent or more of Chevron's stock was acquired by a person or group in a transaction not approved by the Board or in the event of a hostile tender offer that would give a person or group ownership of 20 percent or more of the stock. Upon such an event, the shareholders rights would "flip-in" and entitle each holder of rights (not the 20 percent acquiror) to purchase preferred shares at half their fair value. This in turn would seriously dilute the equity position of the 20 percent shareholder. The Board could redeem the rights for $.05 per right any time before the triggering event. Since dilution could be avoided only by having the

amending the bylaws to change the manner in which special shareholders meetings could be called.[7]

By the beginning of November, Chevron was experiencing significant disruption in its operations. Rumors were spread in the media that Pennzoil was accumulating Chevron shares, Chevron employees were distracted from their jobs by concern about the future of the corporation and management was diverted from activities directed at implementation of the five-year plan.

Another special Board meeting on November 6 devoted entirely to the stock activity lasted most of the morning.[8] The directors had previously been provided with a legal memorandum by Fried Frank and Pillsbury analyzing Chevron's current defenses, vulnerabilities, and possible actions to protect shareholders and a booklet prepared by Goldman Sachs, Fried Frank and Pillsbury summarizing topics to be discussed at the meeting. At the meeting, the directors received a briefing book similar to the previously provided materials. Fried Frank advised the Board about the business judgment rule, informing the directors that their actions would be protected if they reasonably believed there was a threat to corporation policy and effectiveness and took reasonable steps in response to that threat. The Board was also informed of possible strategies of the accumulator such as attempting to force a restructuring of the corporation, interfering with the business plan, working with a partner to take over Chevron or forcing a swap of its Chevron stock for oil and gas assets.

Goldman Sachs made a presentation about Pennzoil, which it considered the most likely accumulator, addressing Pennzoil's history as an aggressive stock accumulator (including a hostile tender offer for United Gas Company in 1965, an unsolicited tender offer for Getty Oil in 1983 and subsequent $3 billion cash settlement of litigation with Texaco over Texaco's interference with Pennzoil's merger with Getty Oil, and secret acquisition of an 8 percent stake in Burlington Resources in 1989); Pennzoil's public statements that it could defer $800 million in federal income taxes by reinvesting the Texaco settlement proceeds in oil and gas properties similar to the Getty Oil assets it had bargained for before Texaco "interfered" with its bargain, and Pennzoil's possession of $2.6 billion in ready cash from the Texaco settlement

---

Board approve the acquisition of shares or redeem the other shareholders' rights, an acquiror would be unlikely to cross the flip-in threshold without securing a redemption of the rights.

[7]According to the minutes of this meeting, Derr and a representative of Goldman Sachs "reviewed the recent activity in Chevron stock and the various market place rumors related to that activity," the idea of an additional credit facility was reviewed, and a representative of Fried Frank summarized Chevron's existing defensive mechanisms for response to an unfriendly takeover attempt and possible changes that might be brought to a subsequent Board meeting. All but one of the directors were present.

[8]All but one of the directors attended this meeting.

and its ability to borrow $3-4 billion more. Legal counsel advised the Board that Pennzoil would have little chance of prevailing on its tax theory unless it took actions to achieve a position similar to that it had had with Getty Oil, i.e., board representation or another form of significant control over Chevron. Goldman analyzed the potential advantages and disadvantages presented by a large shareholder and the impact such a shareholder could have on the corporation and its shareholders.

Legal counsel also advised the Board regarding possible responses to the accumulation, recommending changing the threshold for triggering the grant of rights under the rights plan from 20 percent to 10 percent and amending the bylaws to eliminate shareholders' ability to call special meetings. The Board was given information about other companies with rights plan thresholds below 20 percent. Goldman Sachs advised that in its opinion, lowering the rights plan threshold to 10 percent would not adversely affect the Chevron stock price; in Goldman Sachs's experience with hundreds of such plans, they had discerned no empirical evidence of stock prices being adversely affected. Georgeson provided its opinion that reducing the rights plan threshold would not materially affect the ability of a shareholder to successfully wage a proxy fight in opposition to management. Counsel advised that shareholders do not have an inherent right under Delaware law to call special shareholders meetings and most Delaware corporations do not provide such a right.

The directors also discussed the possibility of arranging a special credit facility for the corporation, in response to concerns that if a hostile accumulator announced acquisition of Chevron shares, Chevron might not be able to secure the funds necessary to maintain ordinary operations. Further consideration of this issue was deferred to the next meeting.

On November 21, the Board held a regularly scheduled meeting that lasted most of the day.[9] The directors were informed that Georgeson had reported that almost 15 million shares were being held in unidentified bank accounts. Major presentations were made by senior managers of Chevron's principal operating companies and divisions regarding the five-year business plan. With respect to the proposed credit facility, Chevron's treasurer explained that the corporation's existing credit line was fully subscribed, additional credit for general corporate purposes was necessary to maintain flexibility, and Chevron's access to credit could be severely curtailed if a hostile accumulator surfaced. The Board voted unanimously to authorize the facility.

After the November 21 meeting, the trading volume of Chevron shares increased again. Investigation by Georgeson and others led the directors to

---

[9]All but one of the directors attended this meeting.

believe the accumulator had purchased 5 percent of Chevron's shares by November 27; under federal securities law, a "Schedule 13D" statement must be filed by the purchaser with the Securities and Exchange Commission within 10 days after crossing the 5 percent threshold. Accordingly, it was believed a Schedule 13D statement would be filed on or about December 7 and a special Board meeting was tentatively scheduled for that date.

On December 7, Derr received a telephone call from Pennzoil's chairman, Hugh Liedtke, informing him that Pennzoil owned about nine percent of Chevron's common stock and planned to file a schedule 13D that day. Liedtke indicated the purpose of the Pennzoil investment was to defer about $800 million in taxes, that Pennzoil might purchase additional shares to maximize its tax situation and that the relationship between Chevron and Pennzoil could be "either friendly or adversarial." Pennzoil's schedule 13D indicated it had spent more than $2.1 billion to acquire 8.8 percent of Chevron's stock (31,524,500 shares), having purchased the majority of this stock within the 60 days preceding the filing of the schedule 13D. According to the schedule 13D, the stock had been acquired as a long term investment which Pennzoil believed might allow it to defer a portion of the federal income taxes it owed on the proceeds from the 1988 settlement of its litigation with Texaco. The schedule 13D further stated that Pennzoil might decide to continue to expend up to an amount equal to the original Texaco settlement net proceeds (approximately $2.6 billion) to purchase additional shares from time to time and that "Pennzoil will monitor on a regular basis its investment in the Shares and the Issuer's business affairs and financial position, as well as the market value of the Shares, conditions in the securities markets and general economic and industry conditions. Depending on the results of Pennzoil's ongoing review, Pennzoil may in the future take such actions in respect of its investment in the Shares as it deems appropriate in light of circumstances existing from time to time."

Nine of the twelve directors were present at the December 7 meeting, four management and five outside. Several directors expressed disbelief in Pennzoil's stated investment intent because of such factors as its history, its tax situation, and, among other things, that the investment represented about 150 percent of Pennzoil's net worth. Legal counsel advised the directors that under securities and antitrust laws, investors were required to report their investment intent accurately in schedule 13D statements and to make certain reports upon acquiring more than $15 million in any stock unless the intent was to hold the stock for investment purposes. Counsel recommended litigation against Pennzoil for violation of these reporting requirements. After reviewing the pros and cons of amendments to reduce the voting rights plan threshold to 10 percent and eliminate the special shareholder meeting

provision, the advisors also recommended taking these actions and the Board, after much questioning and discussion, voted unanimously to do so. The directors were concerned about Pennzoil's being in a position to force the Board to take hasty action and believed the changes they were adopting would result in Pennzoil bringing proposals to the Board, enabling the Board to determine in a considered fashion whether they were in the best interests of all the shareholders.[10]

According to the declaration of appellants' expert, Arthur S. Ainsberg, there was "no conceivable possibility" Pennzoil could independently mount a takeover of Chevron because on December 7, 1989, Chevron's market value was $25 billion, Pennzoil's net worth was $1.5 billion, and Pennzoil's total investment in Chevron was approximately $2 billion. Ainsberg further stated that based on news articles and financial analysts' reports, it was "the consensus of the marketplace" that Pennzoil would receive favorable tax treatment due to its investment in Chevron. Finally, Ainsberg declared that the closing price of Chevron stock fell from $72 to $66.75 per share between December 6 and December 7, 1989, the drop was a direct result of the four actions taken by the Board in response to Pennzoil's schedule 13D filing, and (based on numerous studies and Ainsberg's own experience) there is a statistically significant deterioration in equity value of a company that enacts a shareholder rights plan.

Appellants filed the present action on December 11, 1989. Respondents' motion for summary judgment was filed on January 24, 1992. After a hearing on March 13, this motion was granted and judgment was entered for respondents on May 1, 1992. Appellants' notice of appeal was filed on June 29, 1992.

## DISCUSSION

### I.

Under Code of Civil Procedure section 437c, subdivision (c), a motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is

[10]Derr's declaration states that he did not believe Pennzoil could acquire Chevron but felt it might attempt to force a restructuring that would force Chevron to spin off assets to Pennzoil or might take other actions contrary to the company's long term plan for maximizing shareholder value. Renfrew believed Pennzoil's accumulation of Chevron stock posed a threat to the corporation and shareholders because it seemed likely that Pennzoil's tax-driven goals (which appeared to include a need for Pennzoil to force a spin off of Chevron oil and gas producing properties to make its investment similar to what it had had with Getty) were not consistent with Chevron's long-term plan to enhance shareholder value.

entitled to a judgment as a matter of law." ■ In reviewing the trial court's decision on a motion for summary judgment, we independently assess the supporting and opposing papers according to the same three-step process required of the trial court: " ' "First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond . . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ' "' (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674]; *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

■ Appellants initially contend the trial court erroneously utilized the federal rather than the California standard in reviewing the summary judgment motion. Appellants correctly note that under California law, a defendant moving for summary judgment must make a sufficient showing that there are no triable material issues of fact and there is no burden on the plaintiff to show he or she has a cause of action unless the defendant's initial showing is sufficient to justify summary judgment. (*Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 662-663 [150 Cal.Rptr. 384, 12 A.L.R.4th 27].) Under rule 56 of the Federal Rules of Civil Procedure, a moving party need not produce admissible evidence to negate elements of a claim on which the nonmoving party would bear the burden of proof at trial but satisfies its burden by pointing out to the court that there is an absence of evidence to support the nonmoving party's case; the nonmoving party must establish the existence of an element essential to its case, upon which it has the burden of proof. (*Celotex Corp.* v. *Catrett* (1986) 477 U.S. 317, 322-325 [91 L.Ed.2d 265, 273-275, 106 S.Ct. 2548].) The California standard, not the federal, is followed in California courts. (*Biljac Associates* v. *First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1421-1422 [267 Cal.Rptr. 819].) In claiming that the trial court in the present case erroneously employed the federal standard, appellants cite the court's statement at the hearing on the motion that "[t]he question in my mind is whether plaintiffs have submitted evidence which creates a triable issue of fact . . . ."

Appellant's contention is frivolous. The trial judge expressly stated that the question whether appellants had presented evidence demonstrating the existence of a triable material issue of fact arose because respondents had made a showing negating appellants' case. Thus, in stating his tentative view at the beginning of the hearing, the judge explained that respondents had "made a showing that unless contradicted would entitle them to have their

motion granted," and that appellants' evidence did not establish the existence of a factual controversy. Similarly, the judge's concluding remarks at the end of the hearing were as follows: "I really do believe that the showing that has been made in support of this motion is sufficient and that it does establish without any controversy facts which invoke the business judgment rule, even under the heightened standard where defensive mechanisms are involved. [¶] I think the showing that has been made is sufficient to establish without controversy the good faith and reasonable inquiry of the Directors, both inside and outside. And I do not believe that any contrary factual showing has been made which creates any triable issue of fact in those records. And therefore, I think that the defendants are entitled to have summary judgment granted in their favor." The judge expressly referred to Code of Civil Procedure section 437c in his remarks and there is simply no suggestion in the record that the federal rules played any role in his review of the motion.

■ Appellants also rely on the principles that summary judgment "is a drastic measure which should be used with caution so that it does not become a substitute for trial" (*Biljac Associates* v. *First Interstate Bank, supra,* 218 Cal.App.3d at p. 1420, *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 458 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601]) and that doubts as to the propriety of granting the motion should be resolved in favor of the opposing party. (*Biljac Associates* v. *First Interstate Bank, supra,* 218 Cal.App.3d at p. 1420; *Becker* v. *IRM Corp., supra,* 38 Cal.3d at p. 458.) In particular, appellants note that our case law has found summary judgment rarely warranted in complex antitrust cases, " 'where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953].) Appellants liken the shareholder derivative suit to antitrust litigation, urging that shareholders are not party to the events that take place in corporate boardrooms and can have recourse against directors only by means of full trial where the directors can be subjected to cross-examination.

The cases upon which appellants rely in urging the considerations applicable in antitrust litigation should also apply to corporate litigation do not warrant a conclusion that summary judgment was necessarily inappropriate in this case. In *Morse* v. *Abbott Laboratories* (N.D.Ill. 1991) 756 F.Supp. 1108, 1111, the court noted that a "large number of investors in today's securities markets . . . are significantly distanced from the operations of the corporations in which they have invested." This observation was made in the context of corporate defendants' motion to dismiss a suit under federal securities laws alleging that the corporation had omitted certain material

from its public statements. In response to the defendants' claim that the complaint did not state certain matters with sufficient particularity, the court found that to require more from the plaintiffs would be to effectively prevent their ability to sue by requiring them to have inside information to which they had no access. The present case does not involve a lack of information or access to information; as the trial court noted, the summary judgment motion was heard after "ample" opportunity for discovery (two years) had been exercised.

In *Will* v. *Engebretson & Co.* (1989) 213 Cal.App.3d 1033 [261 Cal.Rptr. 868], a shareholder derivative action was dismissed under the business judgment rule after a compensation committee appointed by the board of directors determined it was in the best interests of the corporation to terminate the lawsuit. This judgment was reversed because the trial court had erroneously conducted a " 'limited review' " of the issue of the committee's good faith and independence when the defendants moved for summary judgment. The court noted that "[a]bsent a full hearing or trial on these issues [concerning the directors' delegation to a minority committee the business judgment authority to terminate derivative litigation], the derivative plaintiff may lose the one opportunity to contest the decision of the board." (*Id.*, at pp. 1043-1044.) The problem in *Will* was that the trial court exceeded its authority on a summary judgment motion by reviewing the merits; the trial court had noted that the defendants' motion would likely have been denied under normal summary judgment rules because there would have been at least the inference of a triable issue of fact. (*Id.*, at p. 1040.) In the present case, the trial court did not review the merits but only determined, in accordance with the rules governing summary judgment, that no triable material issue of fact existed. If this conclusion was correct, there was no bar to granting respondents' motion.

## II.

The parties agree on the general principles of law governing this case; their disagreement is with application of those principles to the facts. ▮ "The business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' [Citation.] A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.' [Citation.]" (*Unocal* v. *Mesa Petroleum Co.* (Del. Super. Ct. 1985) 493 A.2d 946, 954.) "[U]nder the business judgment rule[,] director liability is predicated upon concepts of gross negligence." (*Aronson* v. *Lewis* (Del. Super. Ct.

1984) 473 A.2d 805, 812; *Smith* v. *Van Gorkom* (Del. Super. Ct. 1985) 488 A.2d 858, 873 [46 A.L.R.4th 821].)

When corporate directors adopt defensive measures, however, the possibility that they might be acting to protect their own interests rather than those of the corporation and shareholders creates "an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." (*Unocal Corp.* v. *Mesa Petroleum Co., supra*, 493 A.2d at p. 954.) Accordingly, the directors "must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership" and that the defensive measure taken was "reasonable in relation to the threat posed." (*Id.*, at p. 955; *Ivanhoe Partners* v. *Newmont Min. Corp.* (Del. Super. Ct. 1987) 535 A.2d 1334, 1341; *Moran* v. *Household Intern., Inc.* (Del. Super. Ct. 1985) 500 A.2d 1346, 1356.)

Appellants contend that triable issues of material fact exist as to whether the Chevron directors reasonably perceived a threat to Chevron's policies and effectiveness and whether the defensive mechanisms adopted were reasonable in proportion to the threat posed.[11] With respect to the former, the directors' burden of showing reasonable grounds for believing a threat to corporate policy and effectiveness exists may be satisfied " 'by showing good faith and reasonable investigation.' " (*Unocal Corp.* v. *Mesa Petroleum Co., supra*, 493 A.2d at p. 955; *Ivanhoe Partners* v. *Newmont Min. Corp., supra*, 535 A.2d at p. 1341; *Moran* v. *Household Intern., Inc., supra*, 500 A.2d at p. 1356.) Appellants claim this burden was not satisfied.

First, appellants note the principle that proof of good faith and reasonable investigation "is materially enhanced . . . by the approval of a board comprised of a majority of outside independent directors . . . ." (*Unocal Corp.* v. *Mesa Petroleum Co., supra*, 493 A.2d at p. 955) and urge that there was no such majority in the present case. Of the nine directors who were present and voted at the December 7 meeting, four were management directors and five outside directors. ■ Appellants claim, however, that a majority were interested directors because one of the outside directors— Samuel Armacost—could not be considered independent. "[A] director is independent when he is in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences." (*Kaplan* v. *Wyatt* (Del. Super. Ct. 1985) 499 A.2d 1184, 1189.)

---

[11]While appellant correctly urges that reasonableness is generally a question of fact, factual questions "may be decided as a question of law if, under the undisputed facts, there is no room for a reasonable difference of opinion." (*Powell* v. *Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 363 [212 Cal.Rptr. 395].)

Samuel Armacost was a managing director of Merrill Lynch Capital Markets during 1989. According to the declaration of Chevron's chief financial officer, Martin Klitten, Chevron paid a total of approximately $4.3 million to six companies for investment banking services during the period 1988-1990; of this amount, just over 5 percent went to Merrill Lynch. Armacost's declaration states that he never worked on the Chevron account because of his position on the Board and his compensation from Merrill Lynch was never tied to work that company did for Chevron; Armacost's lack of involvement with the Chevron account was corroborated by the declaration of Harry McMahon, a managing director of Merrill Lynch in Los Angeles, where the Chevron account came to be handled. According to McMahon's declaration, the fees paid by Chevron to Merrill Lynch in 1988-1990 represented some .01 percent of Merrill Lynch's total underwriting revenues and less than .001 percent of its total revenues for that period.

A director's association with a company that does business with the corporation does not in and of itself establish a lack of independence. (*Kaplan* v. *Wyatt, supra,* 499 A.2d at p. 1189.) Appellants offered no evidence to contradict respondents' showing that Armacost was not in a position to be influenced by his association with Merrill Lynch and so failed to create a triable material issue of fact as to Armacost's independence.[12]

█ Appellants next contend the directors' investigation was insufficient. A prima facie showing of good faith and reasonable investigation is established when a majority of the board is comprised of outside directors and the

---

[12]Appellants urge reliance upon *Kaplan* v. *Wyatt, supra,* 499 A.2d at page 1189, is improper because the Delaware Chancery Court is empowered to make factual findings even in summary proceedings whereas the California trial court, on summary judgment, is not. While the trial court in the present case was not permitted to resolve a factual dispute as to whether Armacost was an independent director, however, it is within the proper scope of a ruling on a motion for summary judgment to conclude respondent's evidence established Armacost's independence and appellants failed to cite evidence raising a triable issue of fact in this regard.

Appellants additionally urge the question of "materiality" of Armacost's association with Merrill Lynch was necessarily a question of fact that precluded summary judgment. *TSC Industries, Inc.* v. *Northway, Inc.* (1976) 426 U.S. 438, 450 [48 L.Ed.2d 757, 766-767, 96 S.Ct. 2126], upon which appellants rely, discussed "materiality" in the context of required disclosures under federal securities law and found the assessment of inferences a reasonable shareholder would draw or make for the trier of fact. TSC recognized, however, that where reasonable minds could not differ on the question, "materiality" could be determined as a matter of law. (*Ibid.*) Here, given respondent's showing of Armacost's independence and appellants' failure to show the existence of a factual issue, nothing in TSC precludes summary judgment.

Finally, the directors' declarations each state that they voted for the measures taken because they believed them to be in the best interests of Chevron and the shareholders and that they did not gain anything monetarily or personally from the actions taken. Appellants presented no evidence to the contrary.

board receives the advice of investment bankers and legal counsel. (*Polk* v. *Good* (Del. Super. Ct. 1986) 507 A.2d 531, 537.) It is undisputed that both a majority of the board as a whole (seven of twelve) and a majority of the directors who voted on the challenged actions (five of nine) were outside directors[13] and that the directors were advised by a variety of experts including legal counsel and investment bankers. As appellants characterize the situation, the directors were given a "short" 32-page booklet from Goldman Sachs and a "short" 11-page memorandum from legal counsel on November 6, 1989, which advised certain actions to increase negotiating leverage and encourage negotiation, at a time when no one knew the meaning of the trading activity in Chevron's stock. Appellants contend the directors took these actions based on speculation, without attempting to negotiate with Pennzoil or anyone else and without considering many ramifications of the actions, that they received no new information before December 7 except that the trading activity was continuing, and that they ultimately approved the actions after a meeting on December 7 that lasted only two to three hours.

Appellants' attempt to find a triable issue of material fact in the brevity of the December 7 meeting is unavailing. In the cases upon which appellants rely, directors' investigation was found inadequate because extraordinary actions were adopted after single, relatively short board meetings at which insufficient information was considered. Thus, in *Smith* v. *Van Gorkom*, *supra*, 488 A.2d 858, the board approved a merger after a two-hour meeting despite the facts that the proposal had not been discussed at any prior board meeting, the board did not see a copy of the agreement before or during the meeting, and the board was provided with no analysis of the basis for the merger price per share or the company's intrinsic value. In *Gimbel* v. *Signal Companies, Inc.* (Del. Ch. 1974) 316 A.2d 599, affirmed (Del. Super. Ct. 1974) 316 A.2d 619, the board approved a $480 million sale of assets at a special meeting called on less than two days' notice, based upon only a handwritten outline and an oral presentation, with no updated information on the market value of the assets or information as to potential higher bidders, having first learned of the proposed sale at the meeting and under pressure due to the fact the offer would expire the next day.

According to respondent's evidence, the actions challenged in the present case were taken only after an assessment of the situation over the course of two months, including six meetings and extensive discussion with retained expert advisers. While Pennzoil was not known with certainty to be the accumulator of Chevron stock until December 7, it was identified as the

---

[13]Appellants' only dispute was with the independence of one of the outside directors, as discussed above.

most likely suspect at the October 31 meeting and an extensive presentation about Pennzoil, its history of aggressive stock accumulation and its stated objective of deferring a major tax liability by investing in oil and gas properties, was made at the November 6 meeting. The Board was advised of disruptive actions that might be taken by a major shareholder and that existing corporate defenses were insufficient to protect against such actions. It was further advised that the actions it was considering would not adversely affect shareholder value and would still allow maintenance of an effective proxy fight against management. The directors actively questioned the experts and discussed the proposed measures before acting. This evidence was patently sufficient to establish a prima facie showing of reasonable investigation. Appellants offer no evidence to the contrary.

Appellants suggest a triable issue of fact exists as to how well the Board informed itself because the minutes of the Board's meetings fail to indicate which members were present in person and which by telephone. Under Delaware (and California) law, directors are permitted to attend board meetings by telephone and participation by telephone constitutes presence in person at the meeting. (Del. Code Ann. tit. 8, § 141, subd. (i); Corp. Code, § 307, subd. (a)(6).) The directors' declarations make clear that the directors who attended meetings by telephone were active participants in the meetings. In the absence of any evidence to the contrary, appellants' unsupported suggestion that directors who attend by telephone are "missing something" is insufficient to create a triable issue as to whether the directors were informed.[14]

Appellants also suggest a question exists as to the reasonableness of respondents' perception of a threat posed by Pennzoil because respondents failed to communicate with Pennzoil to discover its true intentions. In *Robert M. Bass Group, Inc.* v. *Evans* (Del. Ch. 1988) 552 A.2d 1227, a board of directors was found not to have conducted a reasonable investigation because it refused to conduct serious discussions with an investor who had proposed a consensual, noncoercive tender offer but instead adopted defensive measures to prevent a takeover. In the case of a proposed consensual

---

[14]In a similar vein, appellants suggest respondents' evidence is insufficient to demonstrate the directors were fully informed and acted independently because the outside directors' declarations indicate they could not remember specifically what happened at most of the Board meetings. This contention is based on the fact that these directors discussed some of the meetings as a group, without distinguishing the events of each one. Review of the declarations, however, reveals the lack of merit in appellants' argument, as the directors included in their declarations the salient information presented and discussed at the meetings, whether or not tied to the specific date a given discussion occurred. Appellants' mischaracterization of the declarations is most evident in their statement that "Mr. Young declare[d] that he 'cannot recall exactly what was said at each of the five meetings that' he did attend." What Mr. Young actually stated was: "While I cannot recall exactly what was said at each of the five meetings that I attended, I do recall the general substance of those meetings."

tender offer, there is obviously reason for negotiation to attempt to obtain terms in the offer that might benefit the shareholders. The present case, however, involves not a tender offer but a secret accumulation of stock; the question for the Chevron Board was not whether to accept or try to improve upon the terms of a proposed offer but how to react to an accumulation of stock that had placed one shareholder in a position of particular power. Pennzoil's publicly stated intent of long term investment was perceived as inconsistent with its goal of obtaining a tax deferral that the Board had been advised depended on Pennzoil's acquisition of a substantial degree of control over Chevron. Appellants offer no support for their suggestion that the Board was required to negotiate with Pennzoil in this situation.[15]

Appellants also contend the court could not properly find the directors reasonably perceived a threat from Pennzoil because respondents "give no coherent description of exactly what the Pennzoil threat consisted." Appellants urge that Pennzoil did not have the resources to mount a takeover of Chevron, did not have a partner with whom to do so, did not ask for board representation and did not threaten a proxy fight.

According to respondents' evidence, the Board was concerned because of Pennzoil's history of hostile stock transactions, its secret accumulation of $2 billion in Chevron stock, its chairman's statement to Derr that the relationship between the two companies could be "friendly or adversarial," its statement in its schedule 13D that it would monitor its investment and take such future action as it deemed appropriate, and the fact the Board had been advised Pennzoil could realize its tax deferral only by acquiring control over Chevron or part of its assets. Respondents do not suggest Pennzoil could have mounted a take over of Chevron but maintain they were advised and believed that Pennzoil, as a large shareholder, could have facilitated a third party's acquisition of control, attempted a restructuring or spinoff of Chevron oil and gas properties, or taken other actions for its own interest that could have been contrary to Chevron's five-year plan or the interests of other shareholders. This evidence demonstrates the directors reasonably perceived a threat from Pennzoil; appellants' evidence that Pennzoil could not itself have mounted a takeover does not create a triable issue as to the reasonableness of respondents' perceptions of the potential threat posed by a major shareholder.

■ Appellants also contend a triable issue of material fact existed as to the reasonableness of the measures adopted by the Board. They rely upon *In*

---

[15]Appellants also rely on the statement in *Shamrock Holdings, Inc.* v. *Polaroid Corp.* (Del. Ch. 1989) 559 A.2d 278, 289, that in most instances a noncoercive, all cash tender offer for all shares could not be considered a threat under *Unocal*. Appellants do not explain the significance of this statement to the present case, which does not involve a noncoercive tender offer.

*re Desoto, Inc. Shareholders Litigation* (Del. Ch. 1990) Fed. Sec. L. Rep. (CCH) 94,964. In that case, the board of DeSoto, Inc., rejected an all-cash tender offer without negotiation, although the investors' proposal stated their willingness to negotiate all aspects of the deal. The board then adopted a stockholder rights plan in addition to its existing defensive devices. When the investors commenced another all cash tender offer, the board rejected the offer and declined to redeem the shareholder rights plan. After a subsequent decision to sell a division of the corporation, the board discussed whether to reconsider the tender offer, was again advised by Goldman Sachs and corporate management that the offered price was inadequate and decided to continue to oppose the offer. In the resulting lawsuit, the court found the plaintiffs had not shown the board acted improperly in adopting the rights plan and initially resisting the tender offer, because the plaintiffs had indicated their willingness to negotiate with the corporation and consider raising the price of their offer, and the corporation's adviser had opined the offer price was inadequate. DeSoto's decision not to redeem the rights plan was viewed as unreasonable, however, because despite the plaintiffs' expressed willingness to consider raising their offering price, DeSoto did not obtain a fair value range from Goldman Sachs and therefore was not in a position to know if the highest offer would have been fair. This failure, along with a failure to ascertain what plaintiffs' higher offer might have been or whether there were other potential suitors, meant DeSoto did nothing to attempt to maximize shareholder values.

In *DeSoto*, the directors failed to explore obvious opportunities to negotiate a potentially lucrative offer that might have maximized shareholder values. In the present case, by contrast, the directors were not faced with a tender offer from a party expressing willingness to negotiate but with a secret accumulation of a massive amount of stock followed by a schedule 13D statement that appeared misleading in light of Pennzoil's stated objectives in acquiring the stock. Nothing in *DeSoto* suggests any unreasonableness in the directors actions here.

In *Robert M. Bass Group, Inc.* v. *Evans*, *supra*, 552 A.2d at pages 1242-1246, the board responded to a tender offer by adopting a restructuring plan that effectively gave control to incumbent management without affording shareholders a control premium, in the face of a tender offer which posed no threat except that the tender offer might not be the highest price that would be obtained if the company were sold. The restructuring, which was economically inferior to the outside offer and made a portion of the company "takeover proof" by tending to entrench management, was held unreasonable in response to the threat posed. The present case, again, does not involve a tender offer that might be in the shareholders' best interests but the threat of disruptive actions by a major shareholder.

In *Ivanhoe Partners* v. *Newmont Min. Corp.* (Del. Ch. 1987) 533 A.2d 585, 609, affirmed (Del. 1987) 535 A.2d 1334, upon which appellants also rely, in response to a tender offer the Board adopted measures that "guaranteed the incumbency of the . . . board (or their designees) and, as a practical matter, assured the defeat of any hostile takeover attempt for possibly ten years." Appellants suggest no evidence that the measures adopted by the Chevron Board would so insulate the incumbent directors. On the contrary, the directors were advised that shareholders would still be able to mount effective proxy fights against management; appellants point to nothing in the measures adopted that would prevent shareholders from voting out management or raising shareholder resolutions at annual meetings.

In *NCR Corp.* v. *American Tel. and Tel. Co.* (S.D.Ohio 1991) 761 F.Supp. 475, the board adopted an employee stock ownership plan in the face of a tender offer. The board was held to have made an uninformed decision because it had not been advised of key information and did not ask questions about, consider certain consequences of or critically examine the plan it adopted. Appellants suggest no evidence of material information the Chevron Board failed to consider.[16]

Respondents' evidence suggests the reasonableness of each of the actions it took in response to the perceived threat posed by Pennzoil's accumulation of Chevron stock. The credit facility was adopted on the recommendation of Goldman Sachs and Chevron's chief financial officer, Klitten. The memorandum prepared by Klitten analyzed Chevron's need for available capital, the need for increasing Chevron's access to credit in the face of possible hostile activity that in the cases of other corporations had caused difficulties in obtaining credit, the advantages of establishing the credit facility before any public announcement by an accumulator (to obtain more favorable pricing and terms and to ensure being able to implement the credit facility),

---

[16]Appellants urge the Board approved lowering the shareholder rights trigger without information as to how this might adversely affect the price of Chevron stock. Respondents' evidence shows the Board was advised by Goldman Sachs, based on its experience with the consequences of adoption of such shareholder rights plans, that this action would not adversely affect the price of stock. Boisi acknowledged in his deposition that there had been studies attempting to prove stock would be detrimentally affected by adoption of rights plans but in the view of the leading law firms in the field and the investment banking community the methodology used in these studies was not effective or accurate. Appellants' expert, however, stated that adoption of shareholder rights plans did have an adverse effect on share value. While this difference in expert advice might suggest the existence of a triable issue as to whether in fact lowering the threshold for a shareholder rights plan adversely affects share value, such a factual issue is essentially irrelevant in this case. Even if it were to be determined that the advice rendered the Board in this regard was erroneous, the Board nevertheless acted upon the advice of its investment banking expert and cannot be considered negligent in so doing.

and the potential negatives of the proposal, including the increased cost of the proposed facility over the existing $3 billion one. That the credit facility was terminated after one year does not (as appellants suggest) demonstrate the decision to approve it was unreasonable but only that the need for additional credit did not in fact materialize.

The directors voted to decrease the trigger for the shareholder rights plan upon advice from their retained experts that such a measure would permit the Board to protect shareholders' interests without adversely affecting shareholder value. The directors' concern was with the leverage a major shareholder would have with respect to proposals that might be in its own, but not necessarily other shareholders', interests. They were advised that lowering the threshold would encourage a potential acquiror to negotiate with Chevron, and that a number of companies had rights plans with 10 percent thresholds. Aside from the claim that the Board acted without information as to the lowered threshold adversely affecting stock value, discussed above, appellants do not suggest what was unreasonable in adopting this measure.

With respect to the decision to amend the bylaws to eliminate shareholders' rights to call special meetings, the directors were advised that under the existing bylaws a raider could use such meetings for the purpose of removing the existing Board or use the threat of such meetings to pressure the Board. The directors were further advised that Delaware law does not give shareholders an inherent right to call special meetings and that elimination of the right afforded by the bylaws would not inhibit a proxy contest in connection with the election of directors at annual shareholders' meetings. Legal counsel pointed out to the directors potential problems with the proposed amendment—adverse stockholder reaction and perception in the financial community that the corporation was concerned about its vulnerability to a takeover—but on balance recommended taking the action. In response to this showing that the bylaws amendment was reasonable, appellants contend the directors gave no consideration to the adverse effects of their decision on corporate democracy. Notwithstanding this statement, however, they offer nothing to refute respondents' evidence that they did consider the fact that shareholders would still be able to mount effective proxy fights against management.

Finally, the directors voted to commence litigation against Pennzoil upon counsel's advice that the schedule 13D statement violated federal securities laws. Appellants contend a triable issue exists as to the reasonableness of this action because the fact the district court dismissed Chevron's complaint suggests the legal advice respondents received was of questionable quality.

The district court granted summary judgment for Pennzoil upon finding that Pennzoil's directors' affidavits established the company did not intend to exert control over Chevron management, Pennzoil relied in good faith on its counsel's belief that such control was not absolutely necessary in order to obtain the tax deferral Pennzoil sought, and Chevron's evidence was insufficient to create a genuine issue of material fact as to the good faith of Pennzoil's disclosure in the schedule 13D. (*Chevron Corp.* v. *Pennzoil Co.* (9th Cir. 1992) 974 F.2d 1156, 1157.) The Ninth Circuit reversed, however, holding that based upon Chevron's evidence ". . . a reasonable inference could be drawn that Pennzoil's schedule 13(d) statement was materially misleading because it failed to adequately disclose Pennzoil's intent to obtain a board position and exert some level of management influence over Chevron's operations." (*Id.*, at p. 1161.) The court noted that while it "need not go so far as to find Pennzoil's section 13(d) claim—that its purchase of Chevron stock was simply a good investment that might provide some tax benefit economically implausible—it is significant that Chevron's analysis makes better economic sense in light of the enormous tax liability Pennzoil will face if the deferral is denied." (*Ibid.*) Contrary to appellants' assertions, the federal litigation thus suggests the decision to sue Pennzoil was a reasonable one. Appellants point to no evidence to the contrary.

In sum, the evidence produced by respondents in support of their motion for summary judgment established that they reasonably perceived a threat from Pennzoil and acted reasonably in response to that threat. Appellants failed to show the existence of any triable material issue of fact with respect to respondents' defense. Summary judgment was therefore properly granted.

The judgment is affirmed.

Smith, Acting P. J., and Phelan, J., concurred.