Filed 12/10/15  Trunzo v. Herling CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL TRUNZO et al., | B260419 |
| Plaintiffs and Appellants, | (Los Angeles County |
| v. | Super. Ct. No. KC062480) |
| WAYNE HERLING et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Dan T. Oki, Judge.  Affirmed.


David Boros, for Plaintiffs and Appellants.


Kate M. Neiswender, for Defendants and Respondents.


\* \* \* \* \* \*

Two creditors of a corporation sued that corporation and three members of its board of directors for breaching three promissory notes, and sued the directors for wrongfully concealing facts when soliciting the loans under one of the notes as well as for tortiously interfering with the corporation's obligations under another of the notes. The individual board members moved for summary judgment, and the trial court granted their motion and dismissed them from the case. We conclude that there was no error, and affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**I. Facts**

Defendant International Environmental Solutions Corp. (IES) is a corporation formed in 2000 by Karen Bertram (Bertram), Cameron Cole and Toby Cole. IES was formed to design, manufacture and sell "pyrolytic" technology—that is, machines that convert "waste to energy" by generating electricity in the course of compacting waste. Toward that end, IES eventually came to own seven patents and two patent applications in the United States and 44 patents or patent applications in other countries. By 2012, IES had issued 25,000 shares of stock to 87 different shareholders.

Defendants Diana Dimitruk (Dimitruk), John Hardy (Hardy), and Wayne Herling (Herling) (collectively, individual defendants) served on IES's board of directors. Dimitruk and Hardy served on the board from June 2010 until June 2012. Herling purchased the right to participate on IES's board in 2004, but only regularly served on the board from January 2010 through June 2012. Dimitruk owned 92.5 shares of IES stock; Hardy, 4 shares; and Herling, 3,250 shares. During the individual defendants' tenure on IES's board, IES held regular shareholder and board meetings, and separately maintained its assets and cash. During that same period, the Board made no distribution to IES shareholders, no distribution of corporate assets to shareholders, and no loans or guarantees to any IES director or officer. In November 2011, the board—which at that time included all three individual defendants—voted to remove Bertram, who had been serving as its president since its creation, for being uncooperative and for suspected malfeasance.

Because the process of developing pyrolytic technology and making it commercially viable is evidently a long one, IES kept solvent in the meantime by borrowing money. Dimitruk loaned IES $100,000, Hardy loaned $160,000, and Herling loaned $610,000.

Plaintiff Ultimate Energy Group, LLC (Ultimate), is a New Zealand company interested in distributing pyrolytic technology; it made two loans to IES memorialized in two promissory notes—a $500,000 loan in early 2009, and an $86,000 loan in late 2009. The $500,000 note granted Ultimate (1) the right to repayment of its loan or (2) the option, upon payment of an additional $10 million to IES, to acquire an exclusive license to market IES's commercially viable machines in 16 states along the eastern seaboard of the United States.

Plaintiff Michael Trunzo (Trunzo) is one of Ultimate's shareholders. He personally loaned IES a total of approximately $368,000 under the terms of a "Master Promissory Note." It is unclear whether IES adopted a revised Master Promissory Note. Trunzo says that Dimitruk and Herling encouraged him to made additional loans, although they deny ever doing so.

To explore further funding, IES signed a "Heads of Agreement" with a New Zealand company called Sustainable Equities in May 2011. Under that agreement, IES and Sustainable Equities gave themselves until June 30, 2011 to conduct due diligence and, if feasible, to "exercise best endeavors to prepare and enter into legally binding more detailed documentation" that would form a new corporation that was to (1) be funded by a $3 million cash infusion from Sustainable Equities and (2) grant Sustainable Equities, among other things, a nonexclusive license to market IES's pyrolytic technology in the United States. By its terms, the Heads of Agreement was an agreement-to-agree, not a binding contract. IES and Sustainable Equities did not enter into a further contract by the June 30, 2011 deadline. Trunzo listened in on IES's board meetings at that time and may have also served as one of its financial advisors; in either case, Trunzo knew about the Heads of Agreement.

IES was nevertheless unable to remain afloat financially. In November 2011, IES filed for voluntary bankruptcy, but later dismissed its case. In March 2012, Bertram and others filed an involuntary petition to put IES in bankruptcy. The petition was granted and, in June 2012, a bankruptcy trustee was appointed to manage IES. The trustee eventually proposed—and the bankruptcy court eventually approved—a plan by which IES's intellectual property would be sold at a foreclosure sale to a newly created company that would be co-owned by IES and the successful bidder at the sale, and the new company would license its intellectual property rights to Sustainable Equities.

IES did not repay any of the loans to the individual defendants, to Trunzo or to Ultimate.[1]

## II.     Procedural Background

In the operative second amended complaint (SAC), Trunzo and Ultimate sued IES and the individual defendants on a variety of contract-based claims. Specifically, Ultimate sued for breach of the $500,000 note (count 1) and the $86,000 note (count 3), for common counts as to both notes (count 4), and for breach of the implied covenant of good faith and fair dealing as to both notes (count 2). Trunzo sued for breach of the $368,000 note (count 5) and for common counts as to that note (count 6). Trunzo also sued the individual defendants for concealing the Heads of Agreement while soliciting him for funds (count 7). And Ultimate sued the individual defendants for interfering with its right to obtain an exclusive license to market IES's pyrolytic machines by entering into the Heads of Agreement (count 8). Among other things, Trunzo and Ultimate sought repayment of their loans, $5 million for the loss of the marketing option, and $5 million in punitive damages.

The individual defendants moved for summary judgment on the ground that they were not personally liable on any of the contract-based claims, and that they neither concealed nor caused any interference with Ultimate's licensing rights because the Heads

---

[1]     Plaintiffs presented evidence that Herling was repaid $83,000, but the trial court sustained an objection to this evidence, and plaintiffs have not contested that ruling on appeal.

4

of Agreement was never more than an agreement-to-negotiate. Ultimate and Trunzo opposed the motion, pointing to various factual disputes and asserting that the individual defendants engaged in conduct that made them personally liable for the contract and tort claims. The trial court granted the motion. The court entered judgment for the individual defendants, and awarded attorney's fees and costs totaling $21,043.76.

Trunzo and Ultimate filed a timely notice of appeal.

## DISCUSSION

A trial court is to grant summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) In reviewing a trial court's grant of summary judgment, we consider all of the evidence before the trial court except evidence to which an objection was made and sustained, liberally construe that evidence in support of the party opposing summary judgment, and resolve any doubts concerning that evidence in favor of that party. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.) Our review is de novo. (*Ibid.*)

## I. Contract-Based Causes of Action (Counts 1-6)

The SAC alleges six different contract-based causes of action (namely, counts 1-6) on three different theories (namely, breach of contract, common counts, and breach of the implied covenant of good faith and fair dealing). To establish a breach of contract, Trunzo and Ultimate (collectively, plaintiffs) must prove (1) a contract, (2) their performance or an excuse for nonperformance, (3) defendant's breach, and (4) resulting damages. (*Kumaraperu v. Feldsted* (2015) 237 Cal.App.4th 60, 70.) The two common counts claims involve the same three promissory notes underlying the three breach-of-contract claims, so also require proof of a contract and breach thereof. (See *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 394 [noting how a common count claim rises or falls on viability of breach of contract cause of action based on same facts].) Similarly, Ultimate's breach of implied covenant claim necessarily presupposes the existence of a contract. (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1244.) Consequently, the propriety of the trial court's summary judgment ruling

5

on all six contract-based causes of action boils down to whether plaintiffs have raised any triable issues of fact as to whether the individual defendants are liable for the breach of any of the three promissory notes. Plaintiffs have not done so.

The individual directors are not liable under the plain terms of the promissory notes. Ultimate's two breach-of-contract claims spring from the two notes issued in 2009, and it is undisputed that those notes are signed by Ultimate and *IES*—not any of the individual defendants. Similarly, Trunzo's breach-of-contract claim springs from the Master Promissory Note which, again, is between Trunzo and *IES*—not any of the individual defendants. Indeed, the signature for IES on each of the three promissory notes is Bertram's, not any of the individual defendant's.

The individual directors are also not liable on the promissory notes under any other theory. A corporation's directors are generally not liable to the corporation's creditors. (Cf. Corp. Code, § 316; *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1040-1041 (*Berg & Berg Enterprises*); *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 505-506 (*Frances T.*).) There are exceptions to this rule, but the undisputed facts demonstrate that none of the three exceptions invoked by Trunzo or Ultimate applies in this case.

A corporate director is jointly and severally liable to a corporation's creditors if the director (1) authorized the distribution (such as dividends) to corporate shareholders while the corporation's liabilities exceeded its assets, (2) authorized the distribution of corporate assets to shareholders "after institution of dissolution proceedings of the corporation" without "providing for all known liabilities of the corporation," or (3) authorized the corporation to make loans or guarantees to any corporate director or officer. (Corp. Code, § 316; see also §§ 315, 500 & 501.) The undisputed facts indicate that none of the individual defendants, during their tenure on IES's board, authorized any distributions to IES shareholders, any distribution of IES assets, or any loan or guaranty by IES.

A corporate director may also be held personally liable for a corporation's debts when the corporation is the director's "alter ego." (*Hasso v. Hapke* (2014) 227

6

Cal.App.4th 107, 155.) However, courts may make a finding of "alter ego" only if (1) there is a "unity of interest and ownership between the corporation and its equitable owner [such that] the separate personalities of the corporation and the shareholder do not in reality exist," and (2) failure to impose alter ego liability leads to "an inequitable result." (*Ibid.*) Here, it is undisputed that the individual defendants owned less than 14 percent (3,346.5 out of 25,000 shares) of IES's stock; in no sense did they "own" IES. What is more, it is undisputed that IES operated as a separate entity, holding shareholders meetings and keeping separate accounts. In short, there is no evidence of a "unity of interest and ownership."

A corporate director may alternatively be personally liable in tort for certain of his or her actions. As a general matter, a corporate director only owes fiduciary duties to the corporation and its shareholders. (*Berg & Berg Enterprises*, *supra*, 178 Cal.App.4th at p. 1037.) However, under the "trust fund" doctrine of California law, a corporate director also owes a fiduciary duty to a corporation's creditors to avoid "actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors' claims" if the corporation is "insolvent" *and* if the director's actions fall outside the "business judgment rule" (that is, the director's decision is not made in good faith or while laboring under a conflict of interest). (*Id.* at pp. 1040, 1045-1047; Corp. Code, § 309 [codifying business judgment rule].) A director is also liable to third parties in tort if he or she "participate[s] in [a tort] or authorize[s] or direct[s] that it be done." (*PMC, Inc v. Kadisha* (2000) 78 Cal.App.4th 1368, 1379; *Frances T.*, *supra*, 42 Cal.3d at p. 508 ["a plaintiff must . . . show that the director specifically authorized, directed or participated in the allegedly tortious conduct"]; *Armato v. Baden* (1999) 71 Cal.App.4th 885, 894-895; *Michaelis v. Benavides* (1998) 61 Cal.App.4th 681, 686-687.) These doctrines do not apply here for two reasons. To begin, plaintiffs never pled these theories. Further, the gravamen of plaintiffs' claims is that the individual defendants interfered with Ultimate's option to acquire IES's intellectual property by concealing and entering into the Heads of Agreement, but the undisputed facts show that the Heads of

7

Agreement was a nonbinding, agreement-to-agree that never ripened into a contract and thus never caused any interference with, or disruption of, Ultimate's option.

Plaintiffs make four further arguments as to why they have shown a triable issue of material fact that should preclude summary judgment.

First, plaintiffs broadly complain that the individual defendants—and, by extension, the trial court—erred in focusing on "the minutiae of when each [defendant] was a director and voted on what." But under the doctrines creating personal liability to individual corporate directors, each individual's status and the corporate actions he or she authorized are central to the question of liability; under these doctrines, the details matter.

Second, plaintiffs argue that the business judgment rule does not apply (or does not apply with full force) when corporate directors grant themselves special treatment (*Gaillard v. Natomas Co.* (1989) 208 Cal.App.3d 1250, 1265-1266 [directors voting to grant themselves special severance packages]) or adopt defensive measures to fend off hostile action by other corporations and thereby to protect their own jobs (*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1367). The argument does not alter our analysis because the business judgment rule only comes into play under the tort theories described above, and those theories were never pled. Moreover, the individual defendants did not in any event grant themselves special treatment (because they, like the plaintiffs, are creditors of IES who have collected none of their debt) and did not take any defensive actions (because the Heads of Agreement was never binding).

Third, plaintiffs point to several factual disputes that they contend preclude summary judgment. Specifically, they point to conflicts in the evidence regarding (1) whether Trunzo served as a "financial advisor" to IES or instead just listened in on IES board meetings, (2) whether the IES board adopted a second, revised master promissory note without first advising Trunzo, and (3) whether the individual defendants encouraged Trunzo to loan more money to IES under the master promissory note. None of these issues, however, is relevant to the analysis set forth above; as a result, they do not preclude summary judgment. (*Christina C. v. County of Orange* (2013) 220

8

Cal.App.4th 1371, 1379 ["only material factual disputes bear any relevance: 'no amount of factual conflict upon other aspects of the case will preclude summary judgment'"].)

Lastly, plaintiffs note that the plan the bankruptcy trustee proposed and the bankruptcy court approved to sell IES's intellectual property to a newly created company co-owned by IES is strikingly similar to the Heads of Agreement. But what the bankruptcy trustee chooses to do in his independent judgment (and with a court's approval) does not retroactively impose liability on the individual directors for signing a nonbinding, agreement-to-agree with similar terms. Plaintiffs also cite *Davis v. Yageo Corp.* (9th Cir. 2007) 481 F.3d 661, but that decision simply held that the pendency of a bankruptcy proceeding does not automatically preempt a state claim for the bad faith invocation of bankruptcy jurisdiction (*id.* at p. 679); *Davis* is accordingly irrelevant.

For these reasons, the trial court properly dismissed the individual defendants from the contract-based claims.

## II.      Tort-Based Causes of Action (Counts 7 and 8)

### A.      *Concealment (count 7)*

Trunzo sued the individual defendants for concealing from him the Heads of Agreement while soliciting additional funds from him. To prevail on a claim for tortious concealment, a plaintiff must establish that "'(1) the defendant . . . concealed or suppressed a material fact, (2) the defendant [was] under a duty to disclose that fact to the plaintiff, (3) the defendant . . . intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff [was] unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.'" (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1130, quoting *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613.) In this case, Trunzo himself admits he was aware of the Heads of Agreement, which makes it difficult for him to establish that he was "unaware of [that] fact." Even if we construe Trunzo's argument to mean that he was unaware of the Heads of Agreement at the time he made some of his earlier loans, Trunzo still cannot establish

9

that he "sustained damage" "as a result of the concealment." That is because the undisputed facts show that the individual defendants only approved the nonbinding Heads of Agreement; they never authorized any followup contract that actually assigned IES's rights to market to anyone else. Trunzo accordingly cannot prove that he was harmed by the individual defendants' failure to disclose the Heads of Agreement. (See *Henson v. C. Overaa & Co.* (2015) 238 Cal.App.4th 184, 192 [summary judgment appropriate where defendant "offer(s) affirmative evidence that negates an essential element of the plaintiff's cause of action"].)

### B. *Intentional interference with a contract (count 8)*

Ultimate sued the individual defendants for intentionally interfering with its $500,000 promissory note with IES because the Heads of Agreement granted to Sustainable Equities some of the same intellectual property rights that the note had granted Ultimate the exclusive option to acquire. To prevail under this theory, Ultimate must show: "'(1) a valid contract between a plaintiff and a third party; (2) defendant's knowledge of th[e] contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55, quoting *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.) Because, as explained above, the undisputed facts show that the Heads of Agreement was not binding and that no binding contract assigning rights to Sustainable Equities was ever signed, Ultimate cannot establish "actual breach or disruption of the contractual relationship" embodied in the IES-Ultimate promissory note.

10

**DISPOSITION**

The judgment is affirmed.  Defendants are entitled to their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
HOFFSTADT

We concur:

_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ

11