Filed 10/16/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RANDHIR S. TULI,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>SPECIALTY SURGICAL CENTER OF THOUSAND OAKS, LLC et al.,<br><br>        Defendants and Respondents. | B321499<br><br>Los Angeles County<br>Super. Ct. No. (BC542350) |

        APPEAL from judgment of the Superior Court of Los Angeles County, Gail Feuer and Robert Draper, Judges. Affirmed.

        Law Office of Bruce Adelstein and Bruce Adelstein for Plaintiff and Appellant.

        Holland and Knight, Jennifer L. Weaver and David I. Holtzman; the Ruttenberg Law Firm and David I. Ruttenberg for Defendants and Respondents.

————————————————

Randhir Tuli is not a medical doctor, but he helped form a medical business. For a time, Tuli contributed to the enterprise, but then he lapsed into inactivity: he did nothing productive. He did, however, keep taking millions from the enterprise's profits. His hardworking surgeon colleagues in this business became restive and sought to buy him out, but Tuli refused to surrender his lucrative perch. Then Tuli directed his lawyer to send an aggressive—and fateful—letter to a wide swath of recipients, including potential investors in the surgical business. The letter was professionally designed to be scary. It suggested the specter of criminal liability for all involved. Tuli had no good faith belief in the factual or legal basis for his specious claim. In response to his baseless and damaging letter, others in the limited liability company warned Tuli they would eject him without compensation, as was their right, unless he cured the situation within 30 days. Tuli spurned their offer. The surgeons made good on their ultimatum: they put Tuli out and paid him nothing.

Tuli launched a decade-long litigation campaign against his former business colleagues. The trial court rejected all Tuli's claims. We affirm.

I

From 1997 to 2005, Tuli and defendant Dr. Andrew Brooks worked together to create a group of surgery centers. Tuli was an experienced and sophisticated entrepreneur whose ventures had won him millions of dollars. At all relevant times, he was represented by legal counsel. Brooks was a surgeon, a veteran of some 15,000 operations.

## A

Tuli and Brooks located five of their surgery centers throughout the Los Angeles area. A sixth was in development in Thousand Oaks. This Thousand Oaks facility is the focus of this dispute. The entity that owned this business had the full name of Specialty Surgical Center of Thousand Oaks, LLC. We refer to it simply as Specialty.

These centers created lower cost alternatives to hospitals: they eliminated a costly intermediary between surgeon and patient. For surgeries in *hospitals*, surgeons receive a fee for their work, but the hospital also charges—and keeps—a separate hospital facility fee that it does not share with surgeons. By contrast, the *centers* charged facility fees they returned proportionally to their owners, who were mainly surgeons, but who also included Tuli. The centers thus allowed doctors to own the surgery facility and to share in its substantial profits, free of hospital surcharges.

The corporate form of ownership for each center was a limited liability company. Specialty was a limited liability company. An operating agreement governed its activities.

As of July 2005, Tuli and Brooks owned equal interests in each company that owned each center. At centers besides Specialty, which then was nascent, other owners were the doctors Tuli and Brooks had recruited to join the limited liability companies, to perform surgeries at the centers, and to generate the centers' income.

Attracting more successful surgeons was important to the centers' profitability. Tuli and Brooks wanted leading surgeons to join the centers' limited liability companies and to bring their

3

business to the premises. Tuli and Brooks set the buy-in price to be low and attractive to the surgeons they were recruiting. The important thing was to gain their loyalty to—and their business at—the center. The more intensively the center was in use, the higher its profitability.

In the doctor-patient relationship, surgeons usually make the vital business decision about *where* to operate. The centers wanted to recruit more successful surgeons, and thus more surgeries and more revenue.

Between 1999 and 2005, Tuli and Brooks conducted between 15 and 30 syndications to bring new surgeons into their companies. Attracting new physician partners was the "lifeblood" of growing the facility. Brooks explained that "[p]hysicians start to retire, slow down, others move to a different area. So you want to always try to attract the best and most talented surgeons to your facility."

B

In 2005, a Tennessee entity we will call Symbion paid Brooks and Tuli over $16 million each to buy their interests in every center except the Specialty location. Part of this transaction included Brooks' and Tuli's separate medical management company called Parthenon Management Partners, LLC, or Parthenon for short. Tuli and Brooks received an additional $333,333 for Parthenon's management rights. Tuli and Brooks also entered into consulting agreements with Symbion. The consulting agreement fetched Tuli an additional $500,000 from 2008 to 2012.

The Symbion transaction gave separate treatment to Specialty, which then was in development. Symbion took a 1%

4

interest in Specialty, with options to increase its share in the future. Tuli and Brooks collectively owned the other 99%.

Tuli, Brooks, and Symbion set up Specialty to be a pass-through entity. Specialty did not accumulate retained earnings. Every month, it distributed to members all the revenue it collected from recent surgeries. The idea was to convince the member surgeons that this was an attractive and immediately profitable place for them to conduct surgeries. As Tuli testified, "[y]ou want to make them feel like, hey, I'm earning something valuable here." As a result, every month Specialty would exhaust its cash on hand.

Specialty did not own physical assets. Personally and separate from Specialty, Tuli and Brooks had jointly owned the physical property, but Tuli sold his half of this asset to Brooks for $2 million before this dispute arose.

Specialty's only real asset, then, was its members' entitlements to get a share of the revenues from future surgeries. Its one asset was prospective only.

Symbion, Tuli, and Brooks negotiated the original operating agreement for Specialty. They signed this agreement in 2005.

There was no publicly traded market in Specialty's shares. Tuli and Brooks had designed Specialty to be a closed and selective organization; they wanted complete control over the surgeon investors they would solicit and would accept for membership in their elite and highly profitable firm. It took a lot more than just money to become a Specialty member. As Brooks testified, "It's just like a law firm. Legally, I could probably own part of a law firm, but I would never do that, never be allowed to do that. It's not a marketable security. It's very limited people

5

who you could sell it to, who would be qualified physician investors, and every transfer has to be approved by the governing board."

The 2005 purchase agreement gave Symbion two options to buy additional shares in Specialty. Symbion exercised the first option in February 2009, purchasing membership units from Tuli and Brooks for $54,265 per unit.  Other doctors also had purchased membership interests in Specialty, and so Symbion's option exercise meant Tuli and Brooks then each owned an 11.3% membership interest in Specialty.

Symbion's second option had an exercise date in 2011.  Had Symbion exercised that option, it would have taken over all of Tuli's and Brooks' membership interests in Specialty.  Symbion ultimately did not exercise this option.

C

A central feature of each version of Specialty's operating agreement was the provision about a "terminating event."

The terminating event provision was designed to ensure "bad actors" within the company did not damage it.  The founders sought to prevent an insider from destroying the business.

Experience taught Tuli and Brooks that "bad actors" could harm their enterprise.  One bad episode had been with member doctors who had proved to be "very difficult."  These "challenging" physicians had attempted to disrupt the sale to Symbion.  They had behaved opportunistically at the 11th hour of the deal closing, which risked derailing a "massively beneficial transaction" for all concerned.

Tuli and Brooks sought to avoid more problems like that.  They "spent a lot of time negotiating" the terminating event

6

provision. They discussed it in detail with each other and with potential physician members.

Symbion joined Tuli and Brooks in insisting the terminating provision be part of the deal. As a Tennessee company entering the California market for the first time, Symbion wanted the terminating event provision to protect its $60 million investment in a new and risky market. For Symbion, this was a deal point: a must-have protection.

Symbion representative George Goodwin conferred with Tuli about the terminating event provision. "We discussed it on multiple occasions. We reviewed it together. We worked through it. We worked through examples."

Brooks testified that "essentially the [terminating event] concept was we didn't want to reward bad behavior."

A "terminating event" would occur when "[a] Member has disrupted the affairs of the Company or has acted adversely to the best interests of the Company, as determined in the reasonable discretion of the Governing Board, and fails to cure such conduct within thirty (30) days after receipt of a written notice of such conduct sent by the Governing Board to such Member."

The pertinent consequence of a terminating event was loss of the offending member's Specialty shares.

Tuli, Brooks, and Symbion designed a formula that normally would set the price at zero.

Tuli and Brooks discussed how the operating agreement formula for calculating payments after a terminating event "would most likely always come out to zero."

In other words, if the offender did not cure within 30 days, Specialty would cut off the offender's access to the stream of

7

future distributions.  Specialty would put that person out in the cold without current payments or future distributions.  The relationship would be over.

This provision had real teeth.  It created a powerful incentive for good behavior, because it allowed the company to eject a misbehaving member without paying anything to remove the bad member's ownership stake.

Tuli liked and endorsed the terminating event provision. Tuli told Brooks he wanted to use this provision on one of the disruptive doctors who had caused problems for the business.

In 2005, Tuli and Brooks sent a letter to other doctors in Specialty describing the "positive" features of the operating agreement.  These "positive" features included the terminating event provision.

### D

Once it opened for business, Specialty was immediately and impressively profitable.  Tuli shared in the bounty.  He ultimately received a net benefit of  $3,034,512 on his investment of $100,000:  more than a thirtyfold return.  In 2013 alone, for instance, Specialty distributed $1,177,563 to Tuli.

Specialty's operating agreement specified a governing board would manage the company.  In 2013, the six on the governing board were Brooks, Dr. David Chi, Dr. Glenn Cohen, Dr. Mark Farnum, George Goodwin, and G. Miles Kennedy. Goodwin and Kennedy were affiliated with Symbion and were not doctors.  Tuli was not on the board.

### E

Friction arose at Specialty when Tuli wandered off the job—permanently.

8

From 2005 to 2007, Tuli and Brooks worked together closely. During this time, Tuli was at Specialty's office on virtually a daily basis.

In 2005, however, relations began to sour between Tuli, on one hand, and Brooks and Symbion representative Goodwin, on the other.

By the end of 2007, Tuli had completely abandoned Specialty. Brooks testified he called Tuli at least "15 to 20 times and told him that the doctors are asking me a lot of questions. So it was creating [lots] of grief for me with the physicians, so I would call him and say you need to show up and at least show your face, do something. . . . [Tuli said,] Oh, I'll come by. I'll do this. I'll do that. But he never showed up." Brooks testified Tuli "completely disappeared. . . . He was completely absent." Rather, Tuli "went and started a software company, and that was where his attention was focused."

Tuli's inactivity at Specialty caused consternation to its doctor members. Their work generated all of the revenue. By contrast, Tuli's productive effort was zero, but he continued to get 11.3% of the take. At the time of the dispute, for instance, Specialty was distributing over a million dollars a year to Tuli for nothing in return.

In 2010 and 2011, Goodwin, on behalf of the physicians at Specialty, offered to buy Tuli's interest. Tuli refused, claiming their offer was an "unfair lowball price." He wanted more money.

Tuli had a consulting agreement with Symbion that expired in 2012 by its own terms and that Symbion did not renew. For the whole time this agreement was in force, Tuli had done nothing. Yet Symbion had paid him $500,000.

In December 2013, Specialty issued a private offering to potential surgeon investors. The purpose was to seek "new physician utilizers" to expand Specialty's business and to increase revenues. Brooks testified this was "a very important syndication offering . . . which was very critical" to Specialty. Specialty was at a "tipping point" because it was attempting a transition from out-of-network doctors to in-network doctors.

The offering set the price at about $17,000 per unit. This price was the highest Specialty ever set for a sale of its units. Nonetheless, Tuli claimed this unit price was too low.

F

On February 13, 2014, Tuli took his fateful action. He directed his attorney to send a threatening letter. Tuli's decision prompted Specialty to oust him from the company.

1

Tuli's attorney emailed the letter with a cover note (which the trial court referred to as a facsimile) to 23 people connected in some way to Specialty. Some were physicians who were members of Specialty. Others were physicians Specialty was trying to recruit and who were considering investing in Specialty.

Other recipients were non-managerial employees of Specialty. When deposed about the Specialty employees who got the letter, Tuli testified that "I don't know who these people are. . . . I don't know what they do."

One particular employee got the letter, and Tuli was deposed about whether she was a secretary or a receptionist. Tuli testified he had "[n]o idea."

The letter's cover note demanded that all these 23 recipients deliver the attached letter to any potential or prospective investors.

10

With our emphasis, the cover note warned that "[f]ailure to do so may expose you to *individual liability*."

When deposed about how "individual liability" could possibly arise, Tuli testified that, if the recipient were "somehow in cahoots, then she should be." But he added, "I have no idea who's in cahoots." Tuli testified he had "no evidence" that any of the recipients of the letter were "in cahoots."

2

The five-page letter amplified the cover note's threatening tone.

The letterhead identified a law firm that described itself as "LITIGATION LAWYERS." Brooks testified this self-identification made him conclude the author was "an aggressive kind of a lawyer."

The subject line of the letter titled the topic as "cease and desist" regarding the "statutory violations" and "bad faith" dilution efforts.

The running header at the top of the pages included, in red font with red underlining, the words "<u>Cease and Desist Notice</u>."

The first page "urge[d]" each recipient to retain counsel "given the seriousness of the illegal conduct at issue."

The five-page letter explained that Tuli had retained the law firm identified on the letterhead.

The letter called Specialty's proposed private placement offer a "dilution scheme" and proclaimed it was "discriminatory and illegal."

"With this notice in hand and in mind, none of you can claim henceforth you acted without advance knowledge and intent for purpose of establishing 'scienter' " under a federal

criminal statute.  If the recipients proceeded as planned, "you may subject yourself to significant potential liability."

The letter marshaled what it claimed were "[i]ndicia of violations of the anti-kickback statute" and charged that the "re-valuation ruse of Amendment No. 4 will not shield you from liability."  "None of you should take comfort in the fiduciary duty and liability limitation provisions of the [Specialty] Operating Agreement.  Liability for illegal conduct cannot be waived by contract."  "Tuli wishes to avoid litigation and the bad publicity that it would engender, as well as the cost, distraction, and annoyance, for all concerned.  The business and personal reputational risk attending such litigation is manifest."  Tuli claimed to be concerned about the company's exposure "to liability for statutory and regulatory violations."

3

Brooks summarized his perception of the reaction to Tuli's letter:  everyone "who had received that letter was told that they were committing a felony and needed to go out and hire a lawyer.  And they were very concerned about these kinds of allegations.  We have nurses who have licenses. You have [licensed vocational nurses]. . . .  And you have a bunch of surgeons who largely spent a good amount of their life training to do their -- their job and maintain their licenses.  So that is very important to calm the fears and panic" that the letter ignited.

Brooks thought Tuli's letter was "bizarre and off base and such a bunch of lies that threw a bomb" into Specialty's effort to grow its business by attracting new investors.

Tuli's letter harmed Specialty's business by causing "a great deal of anxiety" among its physicians, employees, and

12

outside investors.  Specialty spent much time and effort to calm these fears.  This evidence was undisputed.

G

Tuli's saber rattling backfired.  Specialty ejected him from the company without compensation.  Tuli responded with this lawsuit, which is now more than ten years old.

Specialty replied to Tuli's letter the next day.  This reply notified Tuli he had caused a terminating event and he had 30 days to remedy the situation.  The governing board did not hold a meeting or take a *formal* vote on this reply to Tuli, but the board members *informally*, and unanimously, agreed Tuli's letter constituted a terminating event.  This point later assumes significance.

Specialty suggested that, to cure, Tuli should apologize to those who got Tuli's letter, should correct his false statements, and should pay Specialty's attorney fees.  Specialty later estimated its attorney fees were $4,000 at that point.  Specialty did not include this sum in its communications with Tuli.

Tuli never inquired what Specialty's attorney fees might be.

Tuli resolutely refused to cure.  To the contrary, he responded with further aggression, promising that, if Specialty did not do as Tuli demanded, he would pursue full "redress, in and outside of the courtroom, in a very vocal and public manner, against all participants, individually and collectively."

Specialty ousted Tuli in March 2014.  It redeemed Tuli's ownership shares for zero dollars and ended his participation in the company.

The zero dollar valuation of Tuli's redemption was the result of the terminating event formula in the operating

13

agreement. Tuli had an adjusted capital contribution in Specialty of negative $3,034,512. Tuli had already received a net return on his investment of $3,034,512.

H

In April 2014, Tuli sued Specialty, Symbion, and the members of Specialty's governing board. The defendants cross-complained. Tuli moved unsuccessfully for summary adjudication in 2015. He amended his complaint, and in 2016 Specialty moved for summary judgment of Tuli's first amended complaint.

Judge Feuer granted Specialty's motion in a 21-page statement of decision.

The parties agreed to a tolling agreement for Specialty's cross-complaint, and Specialty dismissed it without prejudice. In 2018, this court dismissed Tuli's appeal on the grounds that the tolled cross-complaint raised issues related to the appeal and that the judgment was not final and not appealable. The case returned to the trial court. Tuli amended, and then amended again. In 2019, he filed his third amended complaint.

In 2021, the parties tried Tuli's lone remaining claim for restitution and unjust enrichment before Judge Draper. After a 10-day bench trial, the court rejected Tuli's claim in a 10-page statement of decision.

Specialty dismissed its cross-complaint against Tuli with prejudice. Tuli appealed.

II

Tuli's appeal raises a multitude of issues. None bears fruit. We independently review legal questions and defer to trial court fact finding. (*Scott v. Common Council* (1996) 44 Cal.App.4th 684, 689.)

14

## A

The fundamental principle governing this case is the business judgment rule.

This rule is a presumption that the directors of a corporation make business decisions on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. Courts defer to board judgments that can be attributed to any *rational* business purpose. (*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1366 (*Katz*).) The parties do not dispute that this rule applies to limited liability companies as well as to corporations.

The trial court ruled the business judgment rule insulated Specialty and its decisionmakers from Tuli's claim they breached their fiduciary duty to him. The court found Specialty established this affirmative defense by proving its business purpose was *rational*: Specialty sought to continue to use private offerings to raise capital without baseless allegations of illegality and impropriety from an existing shareholder. The evidence supported Specialty's rational fear that Tuli's letter would scare off potential investors, that it was rational to notify Tuli his letter was a terminating event, and that it was rational to oust him when he refused to cure within 30 days of Specialty's notice.

Tuli contends the business judgment rule should not apply to his case for three reasons: *conflict of interest*, *bad faith*, and *improper investigation*. We examine each exception in turn.

## 1

Tuli claims a *conflict of interest* infected the governing board's decisionmaking, which Tuli maintains made it error to apply the business judgment rule to this case. His logic is that each person on the governing board owned shares in Specialty,

15

and each would gain a personal advantage by voting Tuli out of Specialty and redeeming Tuli's shares for $0, because this reduction proportionally increased each remaining member's ownership interests. Tuli calls this a "paradigmatic case of self-dealing and conflict of interest."

The conflict-of-interest exception to the business judgment rule arises when the interests of the individual decisionmakers diverge from the interest of the enterprise as a whole. A classic example is when directors, faced with a merger, adopt defensive measures but "might be acting to protect their own interests rather than those of the corporation and shareholders." (*Katz, supra*, 22 Cal.App.4th at p. 1367.) This situation sparks the fear the individual decisionmakers are not to be trusted, for they might be serving their self-interest at the expense of the interests of the entity and its owners, like the shareholders. When the decisionmakers' personal interests conflict with the enterprise's interests, the business judgment rule does not apply. (Cf. *Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 430 (*Everest*) [transaction provided benefits to one partner that were not provided to the limited partners].)

The uncontested evidence in this case, however, was that Specialty's decisionmakers *worked in the best interest of the company as a whole*. Judge Feuer noted Specialty had submitted "evidence that there was a benefit to the corporation from terminating Tuli after he had raised issues of legality and 'kickbacks' with respect to the stock offering to potential investors." Tuli has not challenged this statement of the uncontested evidence.

Tuli invokes *Everest*, but nothing in that case suggested the transaction was beneficial to the business entity as a whole. (Cf.

16

*Everest, supra,* 114 Cal.App.4th at pp. 416–432.) Our case thus is fundamentally different from *Everest.*

In sum, the conflict-of-interest exception does not apply to this case because the uncontested evidence showed Specialty's decisionmakers had worked in the company's best interests.

2

Tuli also argues the business judgment rule does not apply because *bad faith* and improper motives drove the governing board to be rid of him.

"Bad faith" is a common law term in corporate law with an indefinite meaning.

"The black letter requires that officers and directors act in good faith to receive the protection of the business judgment rule. The term 'bad faith' is used extensively in corporate law, and the extent to which its meaning varies depending on the context in which it is used is unclear. . . . Illegal conduct may constitute bad faith, and courts have generally stated that the business judgment rule does not apply to knowingly illegal conduct." (Rest., Corporate Governance (Tent. Draft No. 1, April 2022) § 4.02, com. o.)

Tuli argues Goodwin, Brooks, and "the other Defendants" exhibited "extreme animosity against Tuli." "They had been 'extremely upset' with Tuli for a long time, were frustrated that he was earning *high profits* without bringing in business or providing services, and had repeatedly and unsuccessfully tried to buy his units." The italics in this quotation of Tuli's argument are ours.

It is not bad faith to offer to buy out an unproductive element, as Tuli conceded. He admitted there was nothing wrong with offering to buy his shares.

17

Nor is it corporate bad faith for company decisionmakers to be frustrated with a corporate team member who is earning "*high profits*," as Tuli phrased it, for doing nothing. No case Tuli cites has such a holding. We see no logic in adopting this position, which is at odds with the notion that corporate decisionmakers should be working to maximize enterprise value for the benefit of corporate owners. (E.g., Rest., Corporate Governance (Tent. Draft No. 1, April 2022) § 2.01, subd. (a). [objective of a corporation is to enhance the economic value of the corporation].)

Tuli argues that "Brooks' personal dislike of Tuli was shown in the invective in his e-mails." Tuli cites emails in which Brooks, after reading Tuli's aggressive letter, wrote to others and privately referred to Tuli in insulting terms. For example, about a month after getting Tuli's letter, Brooks emailed others in his circle that "Randhir=Ingrate mudda plucka."

In any organization, emotions sometimes can run high. After one business person attacks another before an audience of associates, without a good faith basis, it would be not unusual for the victim to scorn the attacker. Tuli supplies no precedent for extending the concept of bad faith to a situation where a company decisionmaker, while working in the company's best interests, privately disparaged a colleague.

Tuli's second argument fails.

3

Tuli makes a third argument as to why the business judgment rule does not apply: Specialty, he claims, did not *properly investigate* the charge in his letter that it was engaging in illegal conduct. Judge Feuer's analysis of this argument, however, was exactly right. She cited the undisputed evidence that Specialty *already* had investigated this legal issue before

18

Tuli's letter.  She likewise noted Tuli offered no evidence that additional investigation would have changed anything.  The trial court distinguished this situation from a whistleblower situation "where a shareholder would alert members of a corporation or LLC to actual illegal activity, or that the Board was attempting to take action without any investigation at all into its legality."

Rather than attempting to rebut the trial court's perceptive analysis, Tuli simply ignores it.

Tuli's third argument does not succeed.

B

Tuli abandoned his claim for declaratory relief and now may not appeal it.

Tuli sought declaratory relief in his original complaint and moved for summary adjudication.  One ground was Tuli's argument that a terminating event properly should have led to a "purchase" of his shares by a Symbion entity rather than a "redemption" of his shares by Specialty.  The trial court rejected this argument because Tuli raised it only in his reply brief.  In our court, Specialty notes Tuli's forfeiture, and adds that the substance of his argument also fails because the procedures were proper in any event.  Tuli indeed forfeited this point.  The trial court did not abuse its discretion by disregarding a matter raised only in a reply brief.

In 2015, the trial court denied Tuli's summary adjudication motion.  Tuli filed a first amended complaint, a second amended complaint, and a third amended complaint.  All of them abandoned Tuli's declaratory relief cause of action.

Amended pleadings supersede the original.  Amendments mean the original pleading no longer functions as a pleading, for

19

the writer has written anew.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 884 (*Foreman*).)

Tuli amended his complaint to remove the declaratory relief claim.  The amended pleading extinguished his original complaint.  The declaratory judgment count is not subject to appellate review.

Tuli offers to distinguish the *Foreman* decision.  That decision, however, stated a robust principle not tied to specific facts.  Our Supreme Court anchored this governing principle decades in the past, and for good reason.  When a plaintiff amends a pleading and drops one of the former claims, that claim is out of the case unless the plaintiff does something to revive what it has abandoned.  On this point, Tuli authored his own fate.

C

In a cursory argument, Tuli complains about the trial court's rejection of his unfair competition claim.  The court, however, ruled correctly.

Tuli's argument was that Specialty engaged in unfair competition by labeling his letter a terminating event, declaring he had disrupted the company, and stripping him of his ownership share without compensation.

The trial court reasoned the business judgment rule protected Specialty's rational action of preventing existing shareholders from telling prospective investors that new investment might be a crime.

The trial court was right because, as we have set forth, the business judgment rule indeed applied, and no exception annulled its operation.  Tuli's appellate argument cites no logic or authority to unhorse this result.  This argument misfires.

20

D

Tuli ineffectively attacks the trial court's ruling on his fiduciary duty claim.

This claim was that Specialty and its members breached their duties to Tuli by casting him out without payment. The trial court applied the business judgment rule and deferred to Specialty's rational purpose of ejecting a company saboteur.

On appeal, Tuli argues Specialty's purpose was to *fund a special distribution* for existing members rather than to *aggregate new business capital*. This argument is unavailing, because both business purposes are rational. Company owners rationally want business returns as well as operating capital.

Tuli also argues Specialty did not follow proper company procedures because the board did not meet and vote before Specialty notified him of the terminating event. The trial court ruled this procedural irregularity was substantively irrelevant, because board members all agreed with Specialty's action. The court also noted Tuli cited no cases saying that technical violations of corporate procedure create an exception to the business judgment rule.

Tuli cites *Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370 (*Scheenstra*). *Scheenstra* held a dairy cooperative violated its contractual duty to allocate milk quotas fairly and uniformly. The cooperative solved an oversupply problem by penalizing some members but putting others in a *better* position than they would have been had there been no problem. (*Id*. at p. 395.) *Scheenstra* ruled this solution was inequitable and beyond the cooperative's contractual range of discretion. (*Ibid.*) The business judgment rule, the court held,

did not trump the limits the contract placed on the cooperative. (*Id*. at p. 388.)

*Scheenstra* does not help Tuli. The contractual breach in *Scheenstra* worked serious harm. The contractual breach here worked Tuli *no* harm. We explain.

The way in which Specialty breached its contractual operating procedures was inconsequential. Tuli's argument was based on Specialty's breach of its operating agreement in failing to have a *formal* vote of the *entire* governing board before declaring the February 2014 letter a terminating event. Instead, the board acted on the unanimous vote of its *quorum*. All the members of the governing board *informally* agreed to the letter declaring Tuli's letter constituted a terminating event. This fact was undisputed.

Specialty's procedural failing was immaterial, because all members of the governing board agreed Tuli's letter was a terminating event. The trial court also rightly observed Tuli offered no evidence this procedural glitch harmed him.

In sum, *Scheenstra* is not pertinent. It involved a harmful breach of contract. This case does not.

The same analysis applies to Tuli's citation of *Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1123 (*Ekstrom*). A homeowners association violated its own rules by allowing trees in an oceanside community to exceed a defined height. Plaintiffs sued to regain their now-obstructed views. As with *Scheenstra*, *Ekstrom* differs from this case because it involved a harm that was real.

This analysis also disposes of Tuli's repetitive argument about Specialty's breach of the operating agreement.

22

## E

Tuli also appeals the trial court's ruling on a different contract: a consulting agreement with Symbion that Tuli, Brooks, and their management company Parthenon entered on August 1, 2005. The contract specified it would expire on the latest of three particular events.–Tuli now claims Specialty owed him money under this contract. Yet in the trial court Tuli *admitted* the contract had expired by July 2012. A 2012 expiration was the basis for the trial court's ruling.

Specialty repeatedly pointed out Tuli's specific admissions in its respondent's brief. Tuli omitted responding to this point in reply and thereby effectively conceded he has no valid response. Tuli fails to show the trial court result was incorrect.

Separately, Tuli makes a four-sentence argument about his supposed entitlement to what he calls "deferred payments" under yet a different contract. His opening brief does not establish Tuli raised this issue in the trial court. Tuli forfeited this argument.

## F

Tuli alleged Brooks personally breached his fiduciary duty to Tuli by "usurping an opportunity for himself that should have belonged to Parthenon," which was the limited liability company in which Tuli and Brooks were 50/50 owners. The supposedly usurped opportunity was Brooks's renewal of a consulting contract with Symbion that did not include Parthenon or Tuli. The trial court granted summary judgment for Brooks, reasoning that Tuli could bring this claim only as a derivative action on behalf of Parthenon, which Tuli had expressly refused to do. The trial court was right.

A derivative action is a stockholder's representative suit that seeks to redress wrongs to the corporation. Normally the

23

corporation would bring such a suit.  If the corporation fails or refuses to act after proper demand, however, the stockholder's ultimate interest in the corporation justifies the bringing of derivative action to right the wrong.  (*Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 16.)

American law has recognized derivative suits for more than a century.  (See *Dodge v. Woolsey* (1856) 59 U.S. 331.)

The theory is that separating ownership from management can tempt managers to profit personally at the expense of their trust.  Derivative suits are supposed to combat this temptation by holding corporate decisionmakers accountable to stockholders.  (E.g., *Cohen v. Beneficial Indus. Loan Corp.* (1949) 337 U.S. 541, 547–548 (*Cohen*).)

"Equity came to the relief of the stockholder, who had no standing to bring civil action at law against faithless directors and managers." (*Cohen, supra,* 337 U.S. at p. 548.)  Equity allowed a stockholder "to step into the corporation's shoes and to seek in its right the restitution [stockholders] could not demand in [their] own." (*Ibid.*)  "This remedy, born of stockholder helplessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests." (*Ibid.*)

"Unfortunately, the [derivative lawsuit] remedy itself provided opportunity for abuse, which was not neglected.  [Stockholder derivative suits] sometimes were brought *not to redress real wrongs, but to realize upon their nuisance value.* They were bought off by secret settlements in which any wrongs to the general body of share owners were compounded by the suing stockholder, who was mollified by payments from corporate assets.  These litigations were aptly characterized in professional

24

slang as '*strike suits.*'"  (*Cohen, supra,* 337 U.S. at p. 548, italics added.)

The strike suit problem was so severe as to prompt states, including California, to put special safeguards on derivative shareholder lawsuits.  Three special safeguards are the *ownership*, *bond*, and *demand* requirements.

The *ownership* requirement today is codified as section 800 of the Corporations Code, which requires plaintiffs filing stockholder derivative suits to own shares in the corporation at the time of the contested corporate action.  (*Hogan v. Ingold* (1952) 38 Cal.2d 802, 805–807 (*Hogan*); see Corp. Code, § 800, subd. (b)(1) [contemporaneous ownership].)  California law requires *continuous* as well as *contemporaneous* ownership. (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1119 (*Grosset*); *Sirott v. Superior Court* (2022) 78 Cal.App.5th 371, 376–377 (*Sirott*) [limited liability company].)

The purpose of the ownership requirement is to combat strike suits.  (*Grosset, supra*, 42 Cal.4th at pp. 1109 & 1114.)  The idea is to stop a litigation-hungry plaintiff unconnected with the company from swooping in and buying a few shares just to bring a derivative suit.  (*Ibid.*)

The *bond* requirement can, under some circumstances, force plaintiffs to post substantial sums to pursue a derivative suit.  (*Hogan, supra,* 38 Cal.2d at pp. 805–807; see Corp. Code, § 800, subds. (c) & (d).)   The goal is to create a deterrent to unwarranted shareholder derivative lawsuits by providing a mechanism for securing some portion of a prevailing defendant's expenses.  (*West Hills Farms, Inc. v. RCO Ag Credit, Inc.* (2009) 170 Cal.App.4th 710, 715. )

The *demand* requirement compels plaintiffs to attempt to persuade corporate managers to do what is fair and right. (*Eggers v. National Radio Co.* (1929) 208 Cal. 308, 313; see Corp. Code, § 800, subd. (b)(2) [description of demand on board must be pleaded "with particularity"].) In deference to the managerial role of directors and to curb potential abuse, shareholders asserting a derivative claim must make a threshold showing they made a presuit demand on the board to take the desired action. (*Apple Inc. v. Superior Court* (2017) 18 Cal.App.5th 222, 232.)

The corporate principles governing derivative actions apply to limited liability companies. (See Corp. Code, § 17709.02; *Sirott, supra*, 78 Cal.App.5th at p. 381.)

These special safeguards can burden plaintiffs seeking to sue about corporate matters.

To avoid the burden, plaintiffs may seek to recharacterize what is in reality a derivative action as a direct action, thus circumventing these hurdles.

In an apparent attempt to avoid these hurdles, for example, Tuli's complaints specifically alleged he was *not* pursuing derivative litigation.

Courts, however, guard against tactical efforts to recharacterize actions as direct when in reality they are derivative in character. (E.g., *Paclink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 964–966.)

The trial court in this case performed exactly this service: it guarded against Tuli's effort to cast his claim as direct rather than derivative. The court was right to do so.

Tuli's complaint–that Brooks misappropriated an opportunity that properly belonged to the company–is derivative in character. A corporate opportunity is an asset.

26

Misappropriation of a corporate opportunity is misappropriation of a corporate asset. An action is deemed derivative if it seeks to recover assets for the corporation. (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106 (*Jones*) [action is derivative if the gravamen of the complaint seeks to recover assets for the corporation].)

Tuli's allegation is that Parthenon lost a valuable opportunity. Parthenon's loss thus would redound to "the whole body of its stock." (*Jones, supra*, 1 Cal.3d at p. 106.) Redress for that injury would be derivative in character. (See also *Schrage v. Schrage* (2021) 69 Cal.App.5th 126, 153 [it is a derivative claim when the primary complaint is about squandered corporate assets]; *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 127 (*Nelson*) [when the corporation lost opportunities, the injury is to the whole body of stock and the action is derivative].)

Tuli contests this analysis by citing two inapposite cases.

*Smith v. Tele-Communication, Inc.* (1982) 134 Cal.App.3d 338 (*Smith*) is not on point because it did not involve an alleged misappropriation of a corporate opportunity.

John Smith owned 20% of a corporate subsidiary, while a company called Tele-Communications owned the other 80%. Smith and Tele-Communications sold the subsidiary at a profit that generated a total tax liability of $279,013.85. Tele-Communications and the subsidiary filed a consolidated tax return, and the subsidiary transferred $279,013.85 to Tele-Communications. Smith alleged that, if the $279,013.85 had not been paid to Tele-Communications, Smith's initial distributive share would have been increased by 20% or $55,802.77. He brought a direct action against Tele-Communications and the subsidiary's directors for fraud and breach of fiduciary duties,

27

which was held to be direct and not subsidiary in character. (*Smith, supra,* 134 Cal.App.3d at pp. 341–343.)

The *Smith* case is different from Tuli's situation. Unlike Tuli, Smith did not seek to recover something that properly belonged to the corporation in which Smith held shares. Smith did not contend the diminishment in his portion of the assets reflects an injury to that subsidiary company. His injury thus was not a resulting depreciation in the value of its stock. Rather, the gravamen of Smith's claim was direct injury to Smith as the only minority shareholder. Smith therefore suffered sufficient injury to bring that action in his individual capacity. (*Smith, supra,* 134 Cal.App.3d at pp. 342–343.)

By contrast, Tuli described the lost corporate opportunity as something "that should have belonged to Parthenon." The language in Tuli's pleading suffices to distinguish his case from *Smith.*

In passing, Tuli also cites *Crain v. Electronic Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509, 522–523 (*Crain*). The *Crain* case is like *Smith.* (See *Nelson, supra,* 72 Cal.App.4th at pp. 126–127.) In *Crain*, the defendants deprived plaintiffs of their ownership interests in an ongoing business without any compensation and locked the plaintiffs into a shell corporation that had no real assets and did not engage in any business activity. Those defendants ensured the minority's shares would be valueless and unsalable. (*Crain, supra,* 50 Cal.App.3d at pp. 520–521.) Actions to redress these injuries were individual in character and not derivative. (*Id.* at pp. 521–523.)

Loss of an alleged business opportunity would harm Parthenon as a company and thus would diminish the value of all

28

shares in equal measure, but it would not selectively destroy a minority shareholder for the benefit of the majority.

In summary, the trial court correctly granted summary judgment on Tuli's fiduciary duty claim against Brooks.

G

The trial court properly granted summary judgment on Tuli's claim about good faith and fair dealing.

Tuli alleged Specialty had breached the covenant of good faith and fair dealing implied in its operating agreement by ejecting him without payment on the basis of his terminating event.

As stated, the trial court properly found Specialty had *not* breached its operating agreement in a material way. Tuli concedes his claim for breach of the operating agreement's implied covenant of good faith and fair dealing rests on "largely" the same facts as his breach of contract claim. The claim apparently rests on *exactly* the same facts, for Tuli does not describe what the difference might be.

The law implies a covenant of good faith and fair dealing in every contract. The covenant prevents one contracting party from unfairly frustrating the other's right to the benefits of the agreement actually made. (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 349.) The covenant cannot impose substantive rights or duties beyond those incorporated in the specific terms of the agreement. (*Id.* at pp. 327, 349–350; see also *VFLA Eventco, LLC v. William Morris Endeavor Entertainment, LLC* (2024) 100 Cal.App.5th 287, 312–313 (*VFLA*).)

In his opening brief on this point, Tuli identifies no particular ways in which Specialty, in his view, unfairly frustrated the goals and operation of its operating agreement.

29

Rather, this three-paragraph argument primarily cites and endorses *ULQ, LLC v. Meder* (2008) 293 Ga.App. 176, a Georgia case in which the litigants did not raise, and the court did not discuss, the business judgment rule, which has been important in our analysis. Specialty points out the significance of the business judgment rule in its response to Tuli's opening brief. Tuli's reply on this claim omits to mention this rule.

The trial court's summary judgment ruling on this claim was correct.

H

Tuli appeals his loss at *trial*, which concerned only his remaining claim for restitution and unjust enrichment.

After a substantial bench trial, the court rejected Tuli's claim. Tuli's theory was that his loss of shares was an unlawful forfeiture entitling him to restitution. The trial court's ruling was entirely correct.

1

After trial, the court made factual findings, as follows.

All versions of Specialty's operating agreement from 2005 on contained the terminating event provision. Brooks and Tuli discussed this provision with potential physician members. Tuli endorsed it in numerous conversations as a way to ensure "bad actors" would not damage Specialty. With our emphasis, Tuli understood "that with that formula, with the company that was distributing all of its profits, *nobody was going to get anything* when they committed a terminating event and their shares were redeemed."

The court likewise found "there is no question" Tuli's failure to work productively for Specialty after 2007 "caused distress to the doctors who were members of [Specialty]." These

30

doctors were conducting surgeries that provided all of Specialty's revenue. "[I]n their view, Mr. Tuli was taking 11.3 percent of the revenue without making any contribution" to Specialty.

The court found Specialty members offered to purchase Tuli's membership interest in Specialty, but "this was not an indication of any broader conspiracy to deprive [Tuli] of his ownership interest in [Specialty] whatever the means." Further, there was no basis for Tuli's conclusion that the planned private offering of membership interests in Specialty in 2013 and 2014 was a part of a conspiracy to force him out.

The court found Tuli authorized his fateful letter of February 13, 2014. It was his intentional effort to disrupt and adversely affect the best interests of Specialty. Tuli made no effort to ameliorate the letter's effects.

Tuli had no good faith belief that the letter's statements had a factual or a legal basis, or that they were in the best interests of Specialty, its members, or its employees. Tuli did disrupt the business, and his disruption was intentional.

The trial court made credibility findings about Brooks and Tuli, who gave sharply conflicting testimony. Brooks testified he and Tuli had discussed the termination clause at length and that Tuli favored these provisions. Tuli denied these discussions. The court credited Brooks and rejected Tuli's account.

The court ruled Specialty's ejection of Tuli and its redemption of his shares for zero dollars was not an illegal forfeiture. Specialty distributed all available monies to members on a month-to-month basis. The company had no retained earnings and no physical assets. Tuli and Brooks once jointly owned its physical facility, but in 2007 Tuli sold his half of the building and property interest for two million dollars.

31

Membership in Specialty simply gave members the right to receive future profits the enterprise would generate.

The ejected member "would forfeit the right to participate in the future revenues of the business which of necessity would be generated not by that member, but by the remaining members who continued to provide services and bring in revenue for [Specialty]."

In essence, the trial court held the only value of Specialty membership for a non-surgeon was the right to a share of the future revenues those surgeons would generate, and there was nothing unfair, unreasonable, or illegal about cutting off Tuli's access to this future money stream after he had deliberately and in bad faith disrupted the business.

On appeal, Tuli continues to maintain the consequence of the terminating event was an improper forfeiture.

2

We review the law of forfeiture.

Section 3275 of the Civil Code provides that "[w]henever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

Section 3275 does not define the term "forfeiture." Common law courts have given that substance to this doctrine.

A forfeiture is the divestiture of property without compensation or the loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty. (*VFLA, supra,* 100 Cal.App.5th at p. 308.)

32

It is quite possible for a person or entity to suffer a loss, but for the loss not to count as a forfeiture, which the law condemns.

A recent example is the *VFLA* case. The loss there was a six million dollar deposit. A music festival organizer made this deposit to secure three artists' commitment to perform at its festival. (*VFLA, supra,* 100 Cal.App.5th at p. 291.) The organizer's contract with the artists included a force majeure provision. When government officials banned the festival due to the pandemic, the organizer demanded the $6 million back under the force majeure provision. The artists said the deposit was theirs. The courts ruled the contract favored the artists. The organizer protested that "the artists' interpretation would work an invalid forfeiture or penalty." (*Id.* at p. 308.) This court ruled this loss of $6 million was *not* a forfeiture. (*Ibid.*)

Two factors were significant in *VFLA*. First, was there a breach by the forfeiting party? A "breach is not a necessary element of a forfeiture," but it is a "hallmark" of the doctrine. (*VFLA, supra,* 100 Cal.App.5th at p. 308.) Second, was there a reasonable relationship between the size of the loss and the range of harm the parties anticipated at the time of contracting? (*Id.* at pp. 308–309.)

3

We apply the law of forfeiture to this case.

This case turns on the second and more decisive element, which is whether Tuli's loss bore a reasonable relationship to the harm the parties anticipated when they originally entered the contract.

The forfeiture argument failed in the *VFLA* case because the relationship there was reasonable.

The relationship also was reasonable in this case. The anticipated range of harm at the time of contracting was $60 million or more. That was the sum Symbion had invested in the series of surgical centers, which were linked by a common trademark. As Specialty members testified, the medical profession runs on trust, and public accusations that doctors in a particular practice are felons committing crimes could doom the whole business, especially if the charge is being made by a presumably knowledgeable insider.

Tuli's loss bore a reasonable relationship to this $60 million anticipated range of harm. Tuli put nothing into Specialty that he did not recover. To the contrary, he gained an eye-popping 30-to-1 return on his $100,000 investment. He lost only the opportunity to make even more: a prospective right to share in future revenues generated entirely by others. Tuli did nothing to entitle himself equitably to a share of their labors. In fact, for years Tuli had done nothing. And then he effectively tried to tank the company.

Tuli's case is like the *VFLA* situation in another way as well. In both cases, all parties were sophisticated and experienced commercial actors with full access to lawyers and advisors.

In *VFLA*, the festival was a multi-million dollar venture. The festival organizer used a negotiator experienced with dealing with his counterpart from a large and powerful talent agency. (See *VFLA, supra*, 100 Cal.App.5th at p. 293.) Neither side wanted for resources.

In the same vein, Tuli was an experienced and sophisticated business executive. He described himself as "accomplished" in business, noting that he had established,

34

owned, and operated three other successful healthcare businesses before his surgical center ventures with Brooks. Tuli's entrepreneurism won him millions of dollars. Tuli and Brooks had two law firms representing them during contract negotiations, and they had spent over a million dollars in legal fees. They had the time, savvy, and professional assistance to review their contract in detail, including the terminating event provision, which Tuli liked and thought was a good thing.

Tuli has not claimed he was the victim of disproportionate bargaining power when he negotiated and signed the operating agreement. (Cf. Civ. Code, § 1671, subds. (b)–(d) [rules for assessing liquidated damages provisions vary, depending on whether a contracting party is or is not a consumer].)

4

Tuli raises six invalid appellate objections to the trial court's rejection of his restitution claim.

a

Tuli cites *Freedman v. Rector, Wardens & Vestrymen of St. Mathias Parish* (1951) 37 Cal.2d 16 (*Freedman*). In *Freedman*, a buyer deposited $2,000 towards an $18,000 purchase of real estate, but then withdrew and asked for his deposit back. The seller sold the property to someone else for $20,000 but kept the deposit. The court held the seller, having suffered no damages from the buyer's breach, was not entitled to keep the entire $2,000 deposit. (*Id.* at pp. 19–23.)

"The purpose of the rule in the *Freedman* case is to prevent *unconscionable inequities* resulting from a forfeiture. But where, as here, the vendor would have received greater benefit if the property had remained in his hands than the amount obtained by

35

him because of the forfeiture, there is no inequity." (*Bird v. Kenworthy* (1954) 43 Cal.2d 656, 660, italics added (*Bird*).)

Specialty quoted the *Bird* decision in its brief to us. In reply, Tuli failed to rebut this quotation, or indeed to refer to the *Bird* case at all.

*Bird*, however, is an important and clarifying decision. Its focus on "unconscionable inequities" identifies the heart of the forfeiture principle.

The essence of Tuli's case is that he put $100,000 into a company with no physical assets, got 30 times that sum in return, sabotaged the company, and got ejected without access to the future earnings of the surgeons who remained in the business. This situation presents no unconscionable inequity.

At oral argument, Tuli defended his inactivity by pointing out there is nothing illegal about being a passive investor. That is true, but, as Specialty responded, that is not the issue. *Bird* teaches that we must examine the situation to look for unconscionable inequities. Specialty gained no *unjust* enrichment from Tuli. Specialty simply got rid of a bad actor who had profited handsomely from the work of others. Tuli was not entitled to restitution. The *Freedman* holding does not help Tuli.

b

Tuli cites *Hill v. Hearron* (1952) 113 Cal.App.2d 763 (*Hill*), which is a decision of more use to Specialty than to Tuli.

In *Hill*, the Court of Appeal applied the *Freedman* rule to a one-season potato farming partnership between two couples. Each couple spent about $8,000 to put a potato crop in the ground during the 1949 crop season. (*Hill, supra,* 113 Cal.App.2d at pp. 763–764.) The partners named the Hearrons told the other partners, the Hills, that harvesting costs would be about $12,000

36

and asked the Hills to advance their share. The Hills were obligated to do this under the partnership agreement, but they defaulted. The Hearrons paid for the Hills' share and harvested the crop. The Hearrons said, however, that the Hills' default meant, by contract, the Hills forfeited *all* that the Hills had contributed, which now would belong to the Hearrons, minus a $3,011 sum the Hearrons offered to return to the Hills. (*Id.* at p. 765.)

The *Hill* court refused to enforce the contract's forfeiture clause and ruled the Hills were "entitled to an accounting of their interest in the assets of the joint venture at the time of the termination of the agreement, subject to whatever damage [the Hearrons] suffered by reason thereof." (*Hill, supra,* 113 Cal.App.2d at p. 768.)

The *Hill* case entitled the defaulting Hills to the return of the money they had invested in the partnership, minus the damages the Hearrons suffered from the Hills' breach.

The parties in this case seem to agree the opinion excluded from the Hills' recovery any entitlement to the profits from the potato crop.

So interpreted, the *Hill* opinion favors Specialty, not Tuli. Tuli received his original investment back, thirty times over. Specialty denied him the right to future return that Specialty might earn without him, just the way the *Hill* court did not give the Hills a share of the potato profits from the harvest they failed to support.

Alternatively, if we interpret the *Hill* decision as not addressing whether the Hearrons were entitled to retain the 1949 harvest profits, then the opinion is of no help to Tuli and his quest to keep getting a percentage of the surgeons' revenues.

37

c

Tuli suggests that a "contract providing a single payment for multiple types of breaches with different expected harms is an unenforceable penalty." He cites opinions involving contracts requiring payment of a fixed sum of monies in the event of breach. (*Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 797 [payment of $240,912 required if tenant breached lease in any manner]; *Sybron Corp. v. Clark Hospital Supply Corp.* (1978) 76 Cal.App.3d 896, 903 [$28,000 penalty for delay in payment of $30,000]; *Smith v. Royal Manufacturing Co.* (1960) 185 Cal.App.2d 315, 318, 324 [$5,100 to be paid whether the breach occurred after one or 99 machines were taken]; *Dollar Tree Stores Inc. v. Toyama Partners LLC* (N.D. Cal. 2012) 875 F.Supp.2d 1058, 1073 [$2,500 per day if delivery conditions not satisfied].)

These cases are not pertinent. They all involved a breaching party that had contracted to pay a fixed number of dollars to the victim of the breach. Here, the situation is reversed: the victim of the breach, which is Specialty, has paid Tuli, the breaching party, over three million dollars. The terminating event provision removed Tuli's ability to keep getting money from the work of others after Tuli disrupted their business. This was not an unenforceable penalty.

d

Tuli claims there was no rational relationship between his loss of his status as a Specialty member and the harm his fateful letter caused. He claims his letter had little effect on Specialty. This claim errs in two ways.

First, it uses the wrong time frame: it fails to focus on "the actual damages *anticipated by the parties when they negotiated*

38

*the contracts.*"  (*VFLA, supra*, 100 Cal.App.5th at pp. 308–309, italics added.)  When Tuli, Brooks, and Symbion signed the Specialty operating agreement in *2005*, the concern was about a possible loss of a $60 million investment in a new and risky market.  By focusing on the extent of harm to Specialty his letter caused in *2014*, Tuli's use of 20/20 hindsight is the wrong temporal perspective.

Second, the undisputed evidence was that the letter *did* harm Specialty.  Tuli's letter would, and did, have the impact he sought.  In the trial court, Tuli did not dispute the evidence that the governing board was concerned about his letter's impact.  Recall the court also found as a matter of fact that "Tuli's disruption of the business of [Specialty] was intentional."  Tuli's effort now to minimize the disruptive effect *he intended* is in vain.

Tuli's no-rational-relationship argument is unsuccessful.

e

Tuli contends the trial court should have ignored the facts that (1) no public market existed for Specialty's shares, and (2) the value of Specialty shares depended solely on its future earnings.  These contentions are in error.

The fact that Tuli could not sell his Specialty shares in a public market was germane, and the trial court rightly noted this fact.  When there is and can be no public market, the concept of fair *market* value becomes highly theoretical.  In this equitable forfeiture analysis, the trial court was right to anchor its analysis in the actualities of Specialty's value, which sprang from the future revenues the surgeons could generate and not from what a sale on an open market could achieve.

Tuli also criticizes the trial court's focus on the fact that the present value of Specialty shares depended on the future

39

revenues. This focus, however, applied common sense. Specialty had no physical assets. It had no retained earnings, because it paid out all monies received on a monthly basis. Yet the business was highly profitable. Why? Because there would be, predictably, a high future demand for highly skilled surgeons. When patients need surgery, they want reputable and experienced people doing this work on the patients' own bodies. Specialty had a team like that. In the future, patients and their insurance companies predictably would pay sizably for that.

Tuli also argues it was impossible for him to cure his terminating event. He says the operating agreement did not spell out details about how to cure, and there was no guarantee the governing board would have accepted any action he took. But Tuli did not even try. His opening brief states "Tuli did not apologize or retract any claim." Specialty's lawyer gave him suggestions about a cure, but Tuli spurned these ideas with an inflammatory and aggressive response. A good offense sometimes is the best defense, but the heedless aggression by Tuli and his attorney was entirely counterproductive. Tuli cannot complain a cure the company invited him to make was impossible.

In summary, none of these arguments makes headway against the trial court's rejection of Tuli's restitution claim.

f

Tuli faults the trial court for excluding two exhibits showing Symbion had valued Specialty in an amount consistent with estimates at trial by Tuli's valuation expert. Tuli claims these exhibits corroborated this financial expert's similar valuation and helped establish that his fateful letter of February 2014 made a criminal law accusation that was "true."

The trial court rejected the notion that Tuli's letter made statements that were "true." Specialty had conducted an "extensive investigation" of the legal claims in Tuli's letter *before* Tuli sent it. Specialty included a "lengthy" legal analysis of these very claims in its offering memorandum.

Specialty "already thoroughly investigated the legality of the offering, the applicability of the anti-kickback statute and the application of the safe harbor provisions, and obtained an independent valuation of the units." This fact was undisputed.

Tuli offered no evidence that would prove further investigation would establish some sort of legal violations of the type his letter charged. Judge Feuer observed this case was removed from a whistleblower situation where a shareholder would alert members of a company to "actual illegal activity."

At trial, the court listened to Tuli testify at length and made a credibility finding that Tuli "did not have a good-faith belief that the statements made in the letter and facsimile had a factual or legal basis."

Tuli makes a halfhearted attempt to overturn this credibility finding by the court after a court trial. This effort seeks to ascend an overhanging cliff. (E.g., *People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 335.) Substantial evidence supports the court's finding. For instance, Brooks displayed a detailed recollection of his interactions with Tuli, while Tuli mostly "did not recall" many portentous events. Other witnesses corroborated Brooks's account. None corroborated Tuli.

Tuli's effort to attack the trial judge's exclusion of the valuation exhibits is in vain. The court exercised its discretion under section 352 of the Evidence Code. As Tuli admits to us, this evidence was "consistent" with his own expert's valuation,

41

which already was in evidence.  The trial court properly exercised its discretion in excluding this cumulative evidence.  (E.g., *Horn v. General Motors Corp.* (1976) 17 Cal.3d 359, 371.)

## DISPOSITION

We affirm the judgment and award costs to the respondents.


WILEY, J.


We concur:


STRATTON, P. J.


GRIMES, J.